## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| Margaret Budde, Lead Plaintiff pursuant to 7/29/15 Order, and Daniel Ream, individually and on behalf of all others similarly situated, <br><br>      Plaintiff, <br><br> v. <br><br> Global Power Equipment Group, Inc., Raymond K. Guba, Luis Manuel Ramirez, and David L. Willis <br><br>      Defendants. | Case No. 3:15-cv-1679-M <br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> *Jury Trial Demanded* |

## INTRODUCTION

1.   Lead Plaintiff, Margaret Budde, ("Lead Plaintiff"), by her undersigned attorneys, alleges as follows upon personal knowledge as to her own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Lead Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, filings made with the United States Securities and Exchange Commission (the "SEC"), announcements issued by Global Power Equipment, Inc. ("Global Power" or the "Company"), wire and press releases published by and regarding the Company, interviews of former Global Power employees who have personal knowledge of the facts as set forth herein and other information readily obtainable in the public domain.[1]

---

[1]   The Court granted Plaintiffs leave to amend on December 27, 2017. (ECF No. 99.) A redline comparison between this Third Amended Complaint and the Second Amended Complaint (ECF No. 76) is attached as Exhibit 1.

2.      This is a federal securities class action on behalf of all persons and entities, other than Defendants (as defined below), who purchased or otherwise acquired Global Power common stock between September 7, 2011[2] and May 6, 2015, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

3.      Global Power is a comprehensive provider of custom-engineered equipment and modification and maintenance services for customers in the energy, infrastructure, process, and industrial segments. Its customers are in and outside of the United States, in both developed and emerging economies.

4.      Global Power issued materially false and misleading financial statements for its fiscal years ending 2011, 2012, 2013, and 2014. On March 15, 2017, Global Power finally issued its restated financial results in a Form 10-K filed with the SEC (the "Restatement"). The Restatement impacted nearly every line item on the Company's income statement and balance sheet. The line items restated included: cash and cash equivalents; restricted cash; accounts receivable; inventory (raw material, finished goods and inventory reserves); cost and estimated earnings in excess of billing; current deferred tax assets; other current assets; accounts payable; accrued compensation benefits; billings in excess of cost and estimated earnings; accrued liabilities; other current liabilities; deferred tax liabilities and other long term liabilities; property plant and equipment; goodwill; deferred long term tax asset; other long term asset; accumulated

---

[2]      As discussed herein, while Plaintiff understands that the Court dismissed Defendant David Willis and the allegations concerning the Deltak transaction, Plaintiff is leaving those allegations in the Third Amended Complaint for purposes of preserving those allegations for appeal. Without the allegations concerning the Deltak transaction, the class period now begins on May 9, 2013: the day on which Global Power issued its 2013 first quarter financial results (which were ultimately restated).

THIRD AMENDED                                                                                              2
CLASS ACTION COMPLAINT

other income; retained earnings and total stockholders' equity, revenue, cost of revenue, gross profit, selling and marketing expenses, general and administrative expenses, depreciation and amortization, interest expense, foreign currency gain/loss, other income and expense, and income tax expense.

5.      In 2013, Global Power overstated earnings by 20%; it reported earnings of $11.8 million when it actually earned $9.4 million. In 2014, Global Power overstated earnings by a *whopping 524%*, publicly reporting earnings of $11.1 million when, in reality, it lost $47.2 million. In other words, earnings in 2014 were overstated by $58.3 million.

6.      The size of the overstatement of earnings, coupled with the length, frequency, sheer number of line items restated, along with the statements of Global Power former employees, supports that defendants acted with the requisite scienter when the false financial statements were disseminated to investors.

7.      In April 2014 defendant Raymond Guba ("Guba"), Global Power's then Chief Financial Officer, was told by Peggy Gaskill, the then controller of Global Power's ES Segment[3], that the ES Segment's 2013 financial results and, as a result, Global Power's 2013's financial results, contained accounting errors. Specifically, CW 10, a corporate accountant at the ES Segment, learned that the divisions sub-leger did not properly match 2013 revenues and expenses, so the ES Segment had improperly recorded revenue and understated expenses for 2013. CW 10 informed both Gaskill and CW 7, then the President of the ES Segment, of this fact in March or

---

[3]      In this Third Amended Complaint, "ES Segment" refers to Global Power's "Electrical Solutions" segment. The Global Power divisions referenced in this complaint (the Koontz-Wagner Electric Company division, IBI, and the ES Segment), are all part of Global Power's "Product Solutions" division. The "ES Segment" described herein is distinct from Global Power's "Energy Services" division, which is referenced in some of the Company's regulatory filings.

THIRD AMENDED                                                                                          3
CLASS ACTION COMPLAINT

April 2014. Gaskill, in April 2014, met with Guba and informed him of this. Guba stated that he would inform Defendant Luis Manuel Ramirez ("Ramirez"), who served as Global Power's President and Chief Executive Officer ("CEO") of this.

8.      Global Power issued its 2013 year-end financial results on March 17, 2014. Then, throughout 2014, Global Power republished and referenced the 2013 financial results while comparing them to 2014 reported results. Therefore, each time Global Power issued financial results in 2014, both Ramirez and Guba knew those results included re-published 2013 financial results that contained accounting errors.

9.      As part of its restatement, Global Power admitted that the 2013 financial results were overstated, in part, because the ES Segment improperly recognized revenue and failed to properly match expenses.

10.     In addition, CW 7, who reported directly to Ramirez, told Ramirez in telephone calls and in person meetings throughout 2014 that the ES Segment had failed to pay numerous invoices during 2013 despite the existence of accounting records showing that the projects associated with those invoices were recorded as completed. The ES Segment recognized revenue under the completion-of-the-contract methodology, meaning it would only recognize revenue from a project upon completion of that project. But the ES Segment was prematurely recognizing revenue and was not properly matching expenses with the revenue that was already recognized. As such, CW 7 informed Ramirez that the ES Segment's financial statements were inaccurate and were continuing to produce inaccurate financial results.

11.     In July 2014, CW 7, CW 10, Gaskill, Ramirez, Guba, and other Global Power division heads and executives participated in a conference call to discuss each division's financial

results. During this call CW 7 informed Ramirez and Guba that the ES Segment's expected revenues and earnings would be at least $20 million lower than forecast due to accounting issues at the ES Segment. Ramirez and Guba were informed that the ES Segment's sub-ledger did not properly tie into the overall ledger, such that the overall ledger was reporting higher revenue and earnings than the sub-ledger showed, and what was actually occurring.

12.     After learning of the accounting problems at the ES Segment on the July 2014 call, Ramirez and Guba established and participated in weekly calls with the ES Segment to work to ensure that the ES Segment was able to increase its revenues to meet expectations. At no time did Ramirez or Guba offer or suggest any methods on how to correct the accounting errors at the ES Segment.

13.     In late September 2014, prior to the issuance of Global Power's 2014 third-quarter financial results ("2014 Q3 Results"), Gaskill sent an email to Ramirez, Guba, and CW 7, among others, reporting that the ES Segment would incur what CW 7 described as a "major third quarter loss" and would also lose money in the 2014 fourth quarter. Nonetheless, Global Power issued its 2014 Q3 Results on October 30, 2014 and reported increased revenues and earnings, as compared to 2013 third quarter results. No disclosure was made of any "major loss" at the ES Segment.

14.     In October 2014, at a meeting convened by Ramirez held in Atlanta, also attended by Guba, to discuss the ES Segment's worsening financial condition, CW 7 and Gaskill, discussed financial information demonstrating that the ES Segment would incur substantial losses for 2014.

15.     In December 2014, Ramirez placed CW 7 on administrative leave telling CW 7 that "there was something wrong with the financials" from the ES Segment. Ramirez told CW 7 that the Company would undertake an investigation, and, in early January 2015, CW 7 was terminated,

without cause, by Ramirez. No public disclosure was made of the problems with Global Power's financial results at that time.

16.      Despite knowing there was "something wrong with the financials," Global Power issued its 2014 year-end financial results and filed the Company's Form 10-K with the United States Securities and Exchange Commission ("SEC") on March 9, 2015. Ramirez signed his certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certification") attesting that Global Power's financial results were accurate and that its financial statements were fairly presented in accordance with Generally Accepted Accounting Principles ("GAAP"). Ramirez knew, or recklessly disregarded, that Global Power's financial results were materially false and misleading and that his SOX Certification was false and misleading.

17.      Defendant Guba, moreover, was made aware of the financial errors at the ES Segment at least as early as April 2014. According to CW 7, Gaskill met with Guba in April 2014 to review the financial errors discovered at the ES Segment, namely projects that were reported as closed on the accounting system but for which invoices were still not paid and work was not complete. There were at least 10 to 12 projects involving millions of dollars in revenue which were prematurely recorded in 2013. CW 7 understood that Guba was to discuss the issue with Ramirez and determine how to handle the problem.

18.      CW 10 confirmed that Gaskill informed CW 10 that she brought the accounting issues at the ES Segment to the attention of both Ramirez and Guba in April 2014.

19.      Ramirez and Guba each signed SOX Certifications, which were issued when Global Power publicly released its second-quarter, third-quarter, fourth-quarter, and year-end 2014 financial results. Those SOX Certifications attested, among other things, that Global Power's

financial statements were free from error and that there were no internal control issues over financial reporting. These certifications were false, as Ramirez and Guba had both been informed in April 2014 that the ES Segment's financial results for 2013 contained errors and were specifically aware that the ES Segment's third and fourth quarter results contained errors. Prior to publishing the fourth quarter and year-end 2014 results, Ramirez acknowledged and admitted to CW 7 that there was something wrong with the ES Segment's financial results. Yet Global Power did not correct any of its financial results to reflect these accounting errors until it announced it would restate its financial results on May 6, 2015.

20.     As part of the restatement, Global Power admitted that, in its ES Segment "we discovered various errors involving recognizing revenues before the contract was completed and/or before units were shipped/delivered and title transferred. . ." These were the very accounting issues that were reported to Ramirez and Guba beginning in April 2014 and that continued throughout 2014. Yet no mention of these errors was made by Guba, Ramirez, or Global Power until the restatement.

21.     Moreover, as Global Power admitted in the restated financial results, and when it fired its former auditor BDO USA ("BDO") in the middle of the restatement process, Global Power lacked internal controls sufficient to permit it to produce accurate financial results. The accounting errors that led to the restatement were not due to interpretation of complex accounting guidance, but rather due to the improper application of basic accounting principles and the Company's lack of internal control over financial reporting.

22.     Indeed, upon being terminated, BDO identified that the Company's lack of internal controls "included those relating to the **supporting documentation for manual journal entries**

**(including potential internal control implications)**" and "a need to strengthen the Company's internal audit function." With respect to the internal audit function, the Company and BDO discussed evaluating the "**competency and objectivity of the internal audit** function and its ability to effectively perform its duties." (Emphasis added.)

23.     CW 1, Global Power's Internal Controls and Processes Manager based in Irving, Texas, from November 2012 until October 2014, was told by the Company's auditors from BDO that BDO was concerned that Global Power's internal audit department was being depleted and lacked sufficient personnel to effectively perform the internal audit function. BDO indicated that the not employing sufficiently skilled personnel negatively impacted Global Power's ability to ensure that its financial statements were being properly prepared. CW 1 discussed BDO's specific concerns with Guba beginning in November 2013. Guba, however, disregarded the concerns raised by BDO that Global Power's internal audit department was insufficient and unable to properly perform its accounting functions. Neither Guba, nor Ramirez, took any steps to address BDO's concerns that Global Power's internal auditing department was not capable of performing its proper function.

24.     CW 2 was Global Power's Director of Accounting and SEC Reporting from August 2011 through July 2013, and as the Company's Corporate Controller from August 2013 through November 2013. CW 2 reported that Ramirez substantially reduced administrative expenses when he took over, and that all six members of the Company's accounting department left the Company within a six-month period beginning in August 2013. CW 2 stated that Ramirez cut the accounting department's budget for training to zero dollars and oversaw staff accountants and other administrative staff leaving at Global Power's Williams and Braden divisions. CW 2's statements

are consistent with BDO's observations that Global Power's internal audit department, during 2013 and 2014, were unable to properly perform their functions.

25.     CW 8 was a Division Controller for Global Power's Braden manufacturing Division from approximately January 2007 through May 2013, based in Tulsa, Oklahoma. CW 8 also worked as a Director of Financial Reporting from May 2013 through September 2013. CW 8 stated that Ramirez was a hands-on manager. CW 8 stated that Ramirez asked detailed financial questions at the weekly forecast meetings and quarterly review meetings, and seemed to be aware and fully updated on everything that transpired at Global Power. Ramirez was "pretty hard core" as far as asking questions and pushing people to perform. CW 8 believed Ramirez was fully apprised of everything because CW 8 and Ramirez talked weekly about the financials. CW 8 stated they had to go through and provide Ramirez with very detailed explanations on variances and why it was the way it was. CW 8 confirmed Ramirez's knowledge of accounting matters stating: "I don't know how he could play dumb with all of the questions that he asked."

26.     Ramirez and Guba either knew, or recklessly disregarded, that Global Power's internal audit department was deficient, having been decimated by Ramirez's cost cutting. Ramirez and Guba, therefore, acted recklessly when they signed their SOX certifications attesting to the accuracy and completeness of Global Power's financial results for the fiscal years ending 2013 and 2014. Ramirez and Guba also knew, or recklessly disregarded, that Global Power's 2013 and 2014 financial results were inaccurate due to the accounting errors at the ES Segment.

27.     Plaintiff is aware that the Court dismissed the allegations against David Willis in its December 29, 2017 Order. Plaintiff is leaving the allegations against Willis and the allegations involving the Deltak transaction for purposes of preserving the allegations and issue for appeal. In

August 2011, Global Power sold its Deltak subsidiary. In an 8-K filed on September 7, 2011, and signed by Defendant Willis, Global Power reported that it completed the Deltak sale and reported a pre-tax gain of $14.1 million on the sale. However, Global Power did not write-off $18.8 million of goodwill associated specifically with Deltak. Instead, it improperly moved the goodwill amount to its Mechanical Solutions segment. Thus, the Company improperly carried the goodwill of Deltak, an asset of a division it sold, for more than six years. In the Restatement, Global Power acknowledged that the accounting for the Deltak sale did not comply with GAAP and that the Company should have reported a pre-tax loss of $4.7 million on the sale instead of a pre-tax $14.1 million gain. The failure to write-off Deltak's goodwill upon the sale of that unit, and the act of moving the goodwill to another segment, violated GAAP and was undertaken in reckless disregard for the truth.

28.     The SEC is formally investigating Global Power's financial statement restatement.

29.     On May 6, 2015 when Global Power first announced the need to restate 2014 results, its stock price fell by $4.58 per share wiping out more than $75 million in market capitalization. On October 26, 2015, when the Company announced the need to also restate 2013 results, its stock price fell by $.53 per share. On March 30, 2016, when it revealed it would be delisted from the New York Stock Exchange ("NYSE") because it was unable to file its financial results, its stock price fell by $1.00 per share. In total, Global Power's market capitalization declined by more than $200 million from May 6, 2015 to Global Power's announcement of its de-listing from the NYSE.

## JURISDICTION AND VENUE

30.     The claims brought in this lawsuit arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and SEC Rule

10b-5 promulgated thereunder (15 C.F.R. § 240.10b-5). This Court has subject matter jurisdiction

pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331.

31.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C.

§78aa, and under 28 U.S.C. §1391(b), as Global Power has its principal executive offices in this

District and conducts substantial business here. In connection with the acts, omissions, conducts

and other wrongs alleged in this Complaint, Defendants, either directly or indirectly, used the

means and instrumentalities of interstate commerce, including (but not limited to) the United

States mail, interstate telephone communications, internet communications, and the facilities of a

national securities exchange.

## PARTIES

32.     Lead Plaintiff Margaret Budde acquired Global Power common stock at artificially-

inflated prices during the Class Period as set forth in her certification previously filed with the

Court. Lead Plaintiff was damaged by purchasing Global Power common stock at artificially-

inflated prices.

33.     Defendant Global Power purports to be a "design, engineering, and manufacturing

firm providing a broad array of equipment and services to the global power infrastructure, energy

and process industries." Global Power is incorporated under the laws of Delaware, and has its

principle executive offices at 400 East Las Colinas Boulevard, Suite 400, Irving, Texas, 75309.

During the entire Class Period, the Company's common shares traded on the NYSE under the

trading symbol GLPW until March 31, 2016, when they were delisted from the exchange. The

Company's stock now trades on the over-the-counter market.

34.     Defendant Ramirez served as Global Power's President and CEO from July 1, 2012

until he resigned on March 20, 2015. Ramirez signed Global Power's Form 10-K filed with the

SEC for its year-end 2012, 2013, and 2014 financial statements. The financial results in each of those filings contained materially false and misleading financial information. Ramirez also signed SOX certifications for Global Power's 2012, 2013, and 2014 financial results, which were false and misleading. Prior to becoming President and CEO of Global Power, Ramirez served as CEO of GE Energy Industrial Solutions. This action seeks to hold Ramirez liable for the false financial statements issued by Global Power for the quarterly and year-end results for 2013 and 2014 and for issuing a false and misleading SOX Certification which accompanied each of these financial results.

35.     Ramirez was paid a base salary of $550,000 per year by Global Power, and was entitled to participate in Global Power's Incentive Compensation Plan, which targeted a short-term bonus of not less than 80% of Ramirez's annual salary, with a minimum and maximum of 40% to 160%. At least 70% of the bonus was to be based on "pre-established quantitative financial metrics." Ramirez was also granted 33,500 shares of Global Power in the form of restricted stock units upon his hiring.

36.     Defendant Raymond K. Guba served as Global Power's Senior Vice President and Chief Financial Officer ("CFO") from November 18, 2013 until he resigned on September 24, 2015. Guba signed Global Power's Form 10-K filed with the SEC for its 2013 and 2014 annual reports. The financial results in each of those filings contained materially false and misleading financial information. Guba also signed SOX certifications for Global Power's 2013 and 2014 financial results, which were false and misleading. Under the direction of Ramirez, Global Power hired Defendant Guba as Senior Vice President and CFO, replacing Global Power's then-CFO, David L. Willis. This action seeks to hold Guba liable for the false financial statements issued by Global Power for the year-end results for 2013, the quarterly results for 2014 and the year-end

results for 2014 and for issuing a false and misleading SOX Certification which accompanied each of these financial results.

37.    Among other previous positions, Guba served as the Manager of Finance (CFO) for GE Energy Industrial Solutions' Installations and Field Services division. Guba worked at GE at the same and in the same division as Defendant Ramirez.

38.    Guba was paid a salary of $390,000, and was entitled to participate in Global Power's Incentive Compensation Plan, which targeted a short-term bonus of not less than 65% of Guba's annual salary, with a minimum and maximum of 37.5% and 130%. Payment under the bonus program was based on "the extent to which certain predetermined performance objectives" are met, and at the time of his employment, the Company believed that the objectives would "include a mix of Company-wide and division-wide financial goals and individual goals." Guba was also awarded 11,000 restricted stock units in 2014, along with a sign-on grant of 14,000 restricted stock units.

39.    Plaintiff is aware that the Court dismissed the allegations against David Willis in its December 29, 2017 Order. Plaintiff is leaving the allegations against Willis and the allegations involving the Deltak transaction for purposes of preserving the allegations and issue for appeal. Defendant David L. Willis was Global Power's CFO from January 28, 2008 through November 18, 2013. Willis signed Global Power's Form 10-K filed with the SEC for its year-end 2011 financial results which contained false and misleading financial information. Willis also signed SOX certifications for Global Power's 2011 and 2012 year-end financial results, which were false and misleading. This action seeks to hold Willis liable for the false financial statements issued by Global Power for its September 7, 2011 8-K announcing the financial results for the Deltak sale, the year-

end results for 2011 and 2012 and for issuing a false and misleading SOX Certification which
accompanied each of these financial results.

40.     Defendants Ramirez, Guba and Willis are, at times, referred to as the Individual
Defendants.

41.     Because of their positions within the Company, the Individual Defendants
possessed the power and authority to control the content and form of Global Power's annual
reports, quarterly reports, press releases, and presentations to the SEC, securities analysts, money
and portfolio managers, and investors, *i.e.*, the market. The Individual Defendants were provided
with copies of the SEC filings alleged herein to be misleading prior to their issuance and had the
ability to prevent their issuance or to cause them to be corrected. As explained below, the
Individual Defendants signed SEC filings that are at issue in this case.

## CONFIDENTIAL WITNESSES

42.     CW 1 was the Company's Internal Controls and Processes Manager based in Irving,
Texas from November 2012 until October 2014 and in that capacity worked on internal and
external audit requests for operational, SOX certification, and financial year-end audits and
reviews. They[4] also worked on the implementation of COSO principles.

43.     CW 2 was the Company's Director of Accounting and SEC Reporting from
August 2011 through July 2013, and the Company's Corporate Controller from August 2013
through November 2013, and was based in Irving, Texas.

---

[4]     Throughout the Complaint confidential witnesses are sometimes referred to using the
singular they.

Third Amended                                                                                     14
Class Action Complaint

44.     CW 3 was the Director of Quality at Global Power's Koontz-Wagner Electric Company division from 2006 through April 2016. (Global Power acquired Koontz-Wagner in 2012.)

45.     CW 4 was a Senior Financial Analyst: Financial Planning and Analysis from June 2014 through May 2015, and was based in Irving, Texas. CW 4 attended meetings almost every week with Ramirez and Guba.

46.     CW 5 was a Director of SEC Reporting at Global Power from January through August 2014, based in Irving, Texas. CW 5 was employed through an outside staffing agency, and did not work directly for Global Power. Nonetheless, CW 5 was directly involved in the preparation of reports filed with the SEC.

47.     CW 6 was the Corporate Vice President: Treasurer from October 2012 through August 2014, based in Irving, Texas. CW 6 reported directly to Global Power CFO Willis until November 2013, and to Defendant Guba after that. CW 6 attended quarterly Disclosure Control Committee Meetings, where issues surrounding the Company's SEC filings were discussed.

48.     CW 7 was the President of the ES Segment from October 2012 until January 2015. CW 7 reported directly to Ramirez as President of the ES Segment. Prior to being president of ES Segment, CW 7 was Senior Vice President of Operations Support from September 2011 until October 2012. From September 2010 to September 2011, CW 7 was the Chief Operating Industrial Officer for the Williams Industrial Services Division in Atlanta, Georgia.

49.     CW 8 was a Division Controller for Global Power's Braden Manufacturing Division from approximately January 2007 through May 2013, based in Tulsa, Oklahoma. CW 8 also worked

as a Director of Financial Reporting from May 2013 through September 2013. CW 8 reported to Defendant Willis during his tenure at the Company.

50.     CW 9 was a Senior Internal Auditor at Global Power from October 2012 through February 2015. CW 9 reported directly to Lloyd Lassahn, Global Power's Internal Audit Manager from June 2011 through June 2014 and then Global Power's Internal Audit Director from June 2014 through February 2016.

51.     CW 10 was a corporate accountant for KW from 2002 through the time KW was acquired by Global Power. CW 10 continued to work as an accountant in the KW division through August 2014. CW 10 reported directly to Linda Skipper, the controller for the KW/IBI division until April 2014. Thereafter CW 10 reported directly to Peggy Gaskill.

## SUBSTANTIVE ALLEGATIONS

### A.     Overview of Allegations

52.     Global Power's financial statements were riddled with errors and irregularities. In sum, Defendants inflated the Company's financial results when Global Power sold its Deltak subsidiary in 2011. Pursuant to GAAP, Global Power was required to write off the Deltak goodwill when it sold this subsidiary. Instead, Global Power moved the Deltak goodwill balance to another division to avoid the write-off and associated loss on the sale of Deltak. Then, beginning in early 2014, Ramirez and Guba learned that the financials from the ES Segment contained material misstatements starting with the Company's 2013 results and throughout 2014. Ramirez and Guba also learned that Global Power's internal controls were deficient throughout 2014.

53.     It took Global Power almost two years to issue its restated results. During that time-period, BDO, its Class Period auditor "resigned," only later to be "terminated" by Global Power.

54.     The Complaint first discusses the time-line of the restatement: the seriatim disclosure of the "discovery" of false financial information and why it took almost two years for Global Power to issue its restated results.

55.     The Complaint then sets forth allegations as to why the failure to timely write-off the goodwill for the Deltak sale violated GAAP; how and when Ramirez and Guba learned of the accounting errors at the ES Segment and how they continued to cause Global Power to issue clean financial results; and how Ramirez and Guba knew, or recklessly disregarded, that the Company's internal controls were deficient such that they could not truthfully sign their SOX certifications.

56.     Then the Complaint then identifies the faulty accounting and the false and misleading financial statements and explains why these statements were false and misleading when made.

**B.      CEO Ramirez and CFO Guba Resign and Global Power
          Announces Its Financial Results Can No Longer Be Relied Upon**

57.     On March 20, 2015, Defendant Ramirez resigned as President and Chief Executive Officer of Global Power without explanation. The resignation was reported by the Company in a March 23, 2015 press release.

58.     Several weeks later, on May 6, 2015, Global Power filed on form 8-K with the SEC a notice that stated that its 2014 year-end earnings needed to be restated:

> On May 5, 2015, the Audit Committee of the Board of Directors (the "Audit Committee") of Global Power Equipment Group Inc. ("Global Power" or the "Company"), in consultation with its outside advisors and management, concluded that the financial statements for the annual period ended December 31, 2014 should not be relied upon because of accounting errors affecting the fourth quarter of 2014 that were discovered during the first quarter 2015 financial review process. **Those errors resulted in an understatement of the Company's cost of sales in the quarterly and annual periods ended December 31, 2014.**

Pending the issuance by the Company's independent registered public accounting firm, BDO USA, LLP ("BDO"), of its audit opinion in respect of the Company's restated 2014 financial statements, the previously filed financial statements of Global Power for that period, **including the corresponding financial statement information, management's report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, earnings and press releases or other shareholder communications, as well as the auditors' reports on those financial statements and its report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2014, should not be relied upon**. The Company intends to file restated financial information as soon as practicable.

(emphasis added).

59.     Defendant Guba resigned as Global Power's CFO on September 24, 2015 without explanation. The Company noted his resignation without comment in a September 25, 2015 press release.

60.     Several weeks later, on October 26, 2015, the Company filed on Form 8-K with the SEC a notice indicating that in addition to its 2014 results, its 2013 results also could not be relied upon:

As previously disclosed in a Current Report on Form 8-K, filed with the Securities and Exchange Commission on May 6, 2015 (the "May Form 8-K"), the Audit Committee of the Board of Directors (the "Audit Committee") of Global Power Equipment Group Inc. (the "Company"), in consultation with its outside advisors and management, concluded that the Company's financial statements for the annual period ended December 31, 2014 should not be relied upon. The May Form 8-K further disclosed that the Company and its outside advisors would review the effect of the accounting errors on the Company's previously reported financial statements included in its Form 10-K for the year ended December 31, 2014 and also determine whether other periods may have been impacted. **The Company has discovered certain additional accounting errors affecting each of its 2014 fiscal quarters, as well as errors affecting the Company's financial statements for the annual period ended December 31, 2013 and each of the quarterly periods contained therein.**

On October 21, 2015, the Audit Committee, in consultation with its outside advisors and management, **concluded that the financial statements for**

**the annual period ended December 31, 2013 and for all quarterly periods contained in the Company's 2013 and 2014 fiscal years should not be relied upon**. More specifically, the Company's previously filed financial statements for its 2013 and 2014 fiscal years and the interim periods contained therein, including **(i) all corresponding financial statement information, management's reports on the effectiveness of the Company's internal control over financial reporting as of December 31, 2013 and 2014, (ii) all related earnings releases, press releases and other shareholder communications, (iii) the auditor's reports on the Company's 2013 and 2014 financial statements, and (iv) the auditor's reports on the effectiveness of the Company's internal control over financial reporting as of December 31, 2013 and 2014, should not be relied upon**.

(emphasis added).

61.     Thus, as of October 26, 2015, the Company's restatement had escalated solely from an issue about the fourth quarter of 2014 to an issue affecting all of 2013 and 2014.

62.     On December 16, 2015, the Company announced that BDO had resigned from its position as independent registered public accounting firm for Global Power "upon the completion of its audit of the Company's restated financial statements."

63.     Specifically, the Company stated:

On December 10, 2015, the chairman of the Audit Committee (the "*Audit Committee*") of the Board of Directors (the "*Board*") of the Company was orally informed by its independent registered public accounting firm, BDO USA, LLP ("*BDO*"), that BDO was resigning effective upon the completion of its audit of the Company's restated financial statements for its 2013 and 2014 fiscal years (and, if applicable, the restated financial statements for any additional periods that the Company determines require restatement).

As previously announced, an independent special committee of the Board (the "*Special Committee*") was formed in May 2015 to review the facts and circumstances relating to the Company's determination to restate certain of its historical financial results. The Special Committee has substantially completed its investigation concerning issues within its current scope of investigation and expects to conclude its investigation as soon as practicable.

The Audit Committee has accepted BDO's resignation and the Company has commenced a process to select a successor accounting firm. The Company will disclose its engagement of the successor accounting firm once the process has been completed, as required by the Securities and Exchange Commission's rules and regulations.

During the Company's two most recent fiscal years ended December 31, 2014, and the subsequent interim period through the date of notification of BDO's resignation, there were no disagreements between the Company and BDO on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements, if not resolved to BDO's satisfaction, would have caused BDO to make reference to the subject matter of the disagreement in their reports on the Company's consolidated financial statements. BDO's audit reports on the Company's consolidated financial statements for the years ended December 31, 2013 or 2014, when previously filed, did not contain any adverse opinion or disclaimer of opinion, nor was either report qualified or modified as to uncertainty, audit scope, or accounting principles. However, as noted in the Company's Current Reports on Form 8-K, filed on May 6, 2015 and October 26, 2015, the Company's 2013 and 2014 financial statements, including the auditor's reports on the Company's 2013 and 2014 financial statements, and the auditor's reports on the effectiveness of the Company's internal control over financial reporting as of December 31, 2013 and 2014, should no longer be relied upon in light of the pending restatement.

Except for the matter relating to internal control over financial reporting described below, there were no "reportable events," as defined in Item 304(a)(1)(v) of Regulation S-K of the rules and regulations of the Securities and Exchange Commission, during the Company's years ended December 31, 2013 or 2014 or in any subsequent interim period. The Company has authorized BDO to respond fully to the inquiries of the successor accounting firm concerning the subject matter of the reportable event noted below.

Since the date of the Company's determination to restate its financial statements for the years ended December 31, 2013 and 2014, BDO has communicated that the Company has certain material weaknesses in its internal control over financial reporting relating to revenue recognition, inventory costing, and warranty reserves. The Audit Committee has discussed the foregoing with BDO. Given that the relevant audits and reviews are not complete, these internal controls remain subject to review, assessment, and remediation by the Company and do not represent the final and complete conclusions or findings of the Company or the Special Committee.

The Company continues to work diligently to address the internal control and other issues raised by its restatement process and is deploying significant internal and external resources to audit and re-audit its financial statements. Since identifying the accounting issues in May of 2015, the Company has appointed a new Senior Vice President of Finance who is expected assume the position of Chief Financial Officer upon conclusion of the restatement process and has elected three new directors. In addition, the Company has retained multiple staff, consultants, counsel, and accountants to assist with the restatement process with the goal of regaining compliance with the Company's filing obligations in a timely manner. Furthermore, the Company is taking steps to strengthen its internal control over financial reporting and anticipates that the internal control enhancements it has made, and plans to make, in connection with the restatement process, will provide a stronger foundation for future compliance and financial reporting.

The Company provided BDO with a copy of the disclosures it is making in this report and requested that BDO furnish a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the statements made herein. A copy of BDO's letter will be filed as an amendment to this report within two days of receipt by the Company.

64.    On December 17, 2015, BDO wrote to the SEC stating that while it agreed with most of the statements above, it had no basis to agree or disagree with the statement that "[t]he Special Committee has substantially completed its investigation concerning issues within its current scope of investigation and expects to conclude its investigation as soon as practicable."

65.    Indeed, despite the Special Committee representing that it had "substantially completed" its investigation by December 2015, Global Power did not release its restated results until 15 months later. It is thus difficult to fathom how any credible investigation could have been "substantially complete[]" as of December 2015.

66.    On January 26, 2016, the Company filed on Form 8-K with the SEC a notice that its 2012 results also could not be relied upon, and stated that its 2011 and 2012 results were also likely incorrect:

As previously disclosed in Current Reports on Form 8-K, filed with the Securities and Exchange Commission on May 6, 2015 (the "May Form 8-

K") and October 26, 2015 (the "October Form 8-K" and, together with the May Form 8-K, the "Prior Form 8-Ks"), the Audit Committee of the Board of Directors (the "Audit Committee") of Global Power Equipment Group Inc. (the "Company"), in consultation with its outside advisors and management, concluded that the Company's financial statements for the annual periods ended December 31, 2014 and December 31, 2013 should not be relied upon. The Prior Form 8-Ks further disclosed that the Company and its outside advisors would review the effect of the relevant accounting errors on the Company's previously reported financial statements included in its Form 10-Ks for the years ended December 31, 2014 and 2013, and also determine whether other periods may have been impacted. **The Company has discovered similar accounting errors affecting the Company's financial statements for the year ended December 31, 2012.** The Company previously disclosed that it has certain material weaknesses in its internal control over financial reporting relating primarily to **revenue recognition, work in progress, and warranty reserves**. The errors identified in the Company's 2012 financial statements relate to **revenue recognition, cost of sales and warranty reserves**.

On January 21, 2016, the Audit Committee, in consultation with its outside advisors and management, concluded that the financial statements for the annual period ended December 31, 2012 and for all quarterly periods contained therein should not be relied upon. More specifically, the Company's previously filed financial statements for 2012, including **(i) all corresponding financial statement information, management's reports on the effectiveness of the Company's internal control over financial reporting as of December 31, 2012, (ii) all related earnings releases, press releases and other shareholder communications, (iii) the auditor's reports on the Company's financial statements for 2012, and (iv) the auditor's reports on the effectiveness of the Company's internal control over financial reporting as of December 31, 2012, should not be relied upon.**

The Company intends to present its restated consolidated financial statements and related consolidated financial information on an annual and quarterly basis in an amendment to its 2014 annual report on Form 10-K (the "Amended Form 10-K"). **It is currently anticipated that the selected financial data contained in Item 6 of the Amended Form 10-K will contain unaudited financial data for 2011 and 2010 that would be revised to address the same types of errors identified in the Company's 2012 financial statements.** The Company has not yet determined the revisions to be made to the unaudited financial data for 2011 and 2010.

(emphasis added).

67.     Eight months after the Company's initial announcement that it had detected an issue in the fourth quarter of 2014, the accounting issues at Global Power were determined to affect earnings for *every* quarter dating all the way back to 2010.

**C.     Global Power Fires BDO, Accepts Delisting From the NYSE, and Begins to Reveal the Extent of Its False Financials, Internal Control, and Financial Reporting Problems**

68.     On March 30, 2016, Global Power announced that it had fired its auditor, BDO:

> [T]he Company's management recommended to the Company's board of directors (the "Board") and the Audit Committee of the Board (the "Audit Committee") that the Company dismiss BDO as its independent registered public accounting firm with respect to the audit of the Company's financial statements for its 2012 through 2014 fiscal years, effective March 24, 2016, and appoint Hein as its new independent registered public accounting firm for all relevant periods. The full Board and the Audit Committee each approved that change. The Company's Board, Audit Committee, and management believe that this approach will be in the best interest of the Company and its shareholders, and will be the most effective way to complete the audit of the Company's 2015 financial statements, as well as those subject to the ongoing restatement.

69.     Thus, almost a year after Global Power first acknowledged problems with its financial statements, it decided to fire its auditor, BDO, and to start its restatement process all over again with a new auditor, Hein & Associates LLP ("Hein").

70.     That same day, the Company also announced that it would "not become current in its SEC-reporting obligations by March 31, 2016," because its new audit firm was "only recently . . . engaged," and therefore the Company's stock would be delisted from the NYSE and traded on the over-the-counter market on March 31, 2016.

71.     Global Power decided that rather than allowing BDO to complete its restatement by March 31, 2016, which would have saved its listing on the NYSE as previously anticipated by the Company, it would instead fire BDO and accept the punishment of delisting.

72.     The March 30 announcement also provided, for the first time, some details about

Global Power's need to restate its earnings for at least three years:

> [P]rior to the Company's dismissal of BDO, the Company and BDO discussed certain **material weaknesses in the Company's internal control over financial reporting relating to revenue recognition, inventory costing, and warranty reserves**. The Company is in the process of remediating those material weaknesses. Other issues discussed between the Company and BDO included those relating to the **supporting documentation for manual journal entries (including potential internal control implications), a proposed change in accounting methodology for certain construction contracts from the "completed contract" method to the "percentage-of- completion" method, the recognition of revenue on projects that were completed at or after related warranty matters were identified, amounts of warranty accruals and the potential accounting impact of warranties that meet the definition of "extended warranties," recording of expected losses on ongoing construction contracts, and the timing of accrued severance benefits to certain employees**. In addition, the Company and BDO concluded there is a need to perform a goodwill impairment review as a result of the anticipated restatement adjustments to the financial statements and a **need to strengthen the Company's internal audit function**. With respect to the internal audit function, the Company and BDO discussed **evaluating the competency and objectivity of the internal audit function and its ability to effectively perform its duties** (such examination of the internal audit function, collectively with the matters described in the first, third, and fourth sentences of this paragraph, are referred to herein as the "Matters").

(emphasis added).

73.     Global Power thus admitted that its former auditor, BDO raised with the company

the need to "evaluat[e] the competency and objectivity of [Global Power's] internal audit function

and its ability to effectively perform its duties."

74.     Global Power also admitted that BDO raised concerns about "supporting

documentation for manual journal entries (including potential internal control implications)." In

other words, Global Power employees could manually adjust critical accounting entries, and the

Company's internal auditors were either complicit in this behavior or were reckless in failing to detect these improper and unsupported manual adjustments.

75.     The extent of Global Power's accounting irregularities became clear as the Company again and again failed to deliver its restated financial results. Repeatedly, the Company set a date to publish its restated earnings, only to cancel that date and push off the deadline.

76.     On July 8, 2016, the Company issued a press release entitled "Global Power Provides Planned Timing for Filing of Financial Statements for 2016, 2015 and Restated Prior Years," where it claimed that it "anticipate[d] filing financial statements for . . . restated prior years on or about September 30, 2016."

77.     On September 28, 2016, the Company issued a press release retracting its July 8, 2016 press release and stating that it "expects to become current with its [SEC] reporting obligations no later than December 31, 2016," and that it "intends to provide a further update on the anticipated timing of these filings no later than October 31, 2016."

78.     On October 31, 2016, the Company issued a press release entitled "Global Power Confirms Expected Timing for Filing Financial Statements," in which it committed to "become current with its [SEC] reporting obligations no later than December 31, 2016."

79.     On December 12, 2016, the Company issued a press release entitled "Global Power Provides Update on Restatement Process," where it said it "no longer expects that it will become current . . . by December 31, 2016, as previously announced," and that it "expects to provide specifics on its filing schedule by mid-January 2017."

80.     On January 17, 2017, the Company stated that it "expects to report its 2015 financial results and audited and restated 2013 and 2014 financials in February 2017."

81.     On February 24, 2017, the Company announced that it would no longer meet its February 2017 goal, and would instead commit to filing its 2015 financial results in "the next few weeks," but made no specific promise about when it would provide restated financial results for the prior years.

## D.    Global Power Finally Restates Its Earnings

82.     On March 15, 2017, Global Power finally filed with the SEC on Form 10-K its Restatement. The filing included restated audited financial results for 2014 and 2013, and selected, unaudited, restated data dating back to 2011. The restatement is attached as Exhibit Y and is incorporated by reference into this Complaint.

83.     As explained in detail below, Global Power's Restatement was *massive*: almost every single line item for every financial statement made by Global Power during the Class Period was affected by Global Power's admitted lack of internal controls.

### *The Deltak Goodwill Restatement*

84.     Plaintiff is aware that the Court dismissed David Willis in its December 29, 2017 Order. Plaintiff is leaving the allegations against Willis and the Deltak transaction for purposes of preserving the allegations and issue for appeal.

85.      On September 1, 2011, Global Power announced that it had completed the sale of its Deltak business to Hamon Corporation. The Company said that the transaction allowed it to "successfully monetize[] a non-core asset, further enhancing the Company's financial resources while concentrating its portfolio towards power generation end markets" (the "Deltak Transaction").

86.     On September 7, 2011, the Company filed on form 8-K with the SEC a pro forma financial statement reflecting the disposition of "substantially all of the operating assets of Deltak

L.L.C. for $31.0 million in cash." The 8-K disclosed that, after adjusting for working capital, net book value of the disposed asset, and transaction costs, the Company saw a pre-tax gain of $14.1 million, or a post-tax gain of $8.6 million from the transaction.

87.     Defendant Willis was the CFO of Global Power at the time of the transaction and signed the September 7, 2011 8-K.

88.     As revealed in the Restatement, however, when the Company sold Deltak, it did not write-off the associated goodwill, but rather improperly and intentionally moved the balance of Deltak's goodwill to the Company's Mechanical Solutions segment:

> At the time of the sale of our former subsidiary, Deltak LLC (*"Deltak"*), in 2011, we erroneously concluded that Deltak was not a separate reporting unit for the evaluation of the carrying value compared to fair value of goodwill. As a consequence of that conclusion, we allocated $18.8 million of goodwill from Deltak's books to Mechanical Solutions, which resulted in an $18.8 million overstatement of the 2011 pre-tax gain on the sale of Deltak. Consequently, we have erroneously been carrying the related $18.8 million of goodwill on our balance sheets since that time. The after-tax effect of this change totaled $11.5 million as of December 31, 2011 and was reflected as a decrease to the December 31, 2012 opening balance of accumulated retained earnings in our consolidated financial statements in this Form 10-K.

89.     Under GAAP, however, the goodwill should have been written off in fiscal 2011, at the time of the Deltak Transaction. The concept of goodwill and goodwill impairment is an old accounting standard issued by the Financial Accounting Standards Board under Financial Accounting Standards ("FAS") No. 142 *Goodwill and Other Intangible Assets*, and was effective for fiscal financial period beginning after March 15, 2001. Paragraph 39 of FAS 142 specifically states that:

> When a reporting unit is to be disposed of in its entirety, goodwill of that reporting unit shall be included in the carrying amount of the reporting unit in determining the gain or loss on disposal. **When a portion of a reporting unit that constitutes a business is to be disposed of, goodwill associated**

**with that business shall be included in the carrying amount of the business in determining the gain or loss on disposal.** The amount of goodwill to be included in that carrying amount shall be based on the relative fair values of the business to be disposed of and the portion of the reporting unit that will be retained. For example, if a business is being sold for $100 and the fair value of the reporting unit excluding the business being sold is $300, 25 percent of the goodwill residing in the reporting unit would be included in the carrying amount of the business to be sold. However, if the business to be disposed of was never integrated into the reporting unit after its acquisition and thus the benefits of the acquired goodwill were never realized by the rest of the reporting unit, the current carrying amount of that acquired goodwill shall be included in the carrying amount of the business to be disposed of. That situation might occur when the acquired business is operated as a stand-alone entity or when the business is to be disposed of shortly after it is acquired. When only a portion of goodwill is allocated to a business to be disposed of, the goodwill remaining in the portion of the reporting unit to be retained shall be tested for impairment.

(Emphasis added.)

90.      The current accounting guidance after the Codification in 2008 which solidified all accounting standards only reorganized and did not change the standards for goodwill de-recognition under ASC 350-20-40-[1-7] *Intangibles - Goodwill and Others*:

[1] **When a reporting unit is to be disposed of in its entirety, goodwill of that reporting unit shall be included in the carrying amount of the reporting unit in determining the gain or loss on disposal**.

[2] **When a portion of a reporting unit that constitutes a business is to be disposed of, goodwill associated with that business shall be included in the carrying amount of the business in determining the gain or loss on disposal**.

**[3]** The amount of goodwill to be included in that carrying amount shall be based on the relative fair values of the business to be disposed of and the portion of the reporting unit that will be retained. For example, if a business is being sold for $100 and the fair value of the reporting unit excluding the business being sold is $300, 25 percent of the goodwill residing in the reporting unit would be included in the carrying amount of the business to be sold.

[4] However, if the business to be disposed of was never integrated into the reporting unit after its acquisition and thus the benefits of the acquired

goodwill were never realized by the rest of the reporting unit, the current carrying amount of that acquired goodwill shall be included in the carrying amount of the business to be disposed of.

[5] That situation might occur when the acquired business is operated as a standalone entity or when the business is to be disposed of shortly after it is acquired.

[6] Situations in which the acquired business is operated as a standalone entity are expected to be infrequent because some amount of integration generally occurs after an acquisition.

[7] When only a portion of goodwill is allocated to a business to be disposed of, the goodwill remaining in the portion of the reporting unit to be retained shall be tested for impairment.

(Emphasis added.)

91.     Deltak was in fact its own operating business unit with its own goodwill balance. The Company had to intentionally move the Deltak goodwill from Deltak's books onto Mechanical Solutions books. The Company violated ASC 350-20-40-2 when it moved the $18.8 million of goodwill from Deltak's books onto another reporting unit. The applicable accounting guidance has been in existence since 2001 and is not complicated accounting guidance but rather simple and straightforward.

92.     The Company disclosed in the 2011 10-K at p. 27 that in "connection with the sale of the Deltak business unit in 2011, we reduced the Products Division goodwill by $6.4 million on August 31, 2011 and performed an assessment as of the transaction date of the reporting unit affected and concluded that the estimated fair value of the affected reporting unit substantially exceeded the related carrying value and therefore no impairment was recorded." The goodwill write-down of $6.4 million was an amortization of the goodwill balance if the Company did not have any information regarding the value of Deltak's goodwill. However, since the Company knew the value of the Deltak goodwill, the Company should have reduced it to zero and calculate the

gain and loss on the sale of Deltak to include the $18.8 million in goodwill. As a result, rather than report a pre-tax gain of $14.1 million, the Company suffered a pre-tax loss of $4.7 million due to the Deltak Transaction.

93.     This failure to write-off the goodwill associated with Deltak at the time of the Deltak Transaction affected the Company's goodwill account beginning with the Company's 2011 3Q 10-Q filed on November 14, 2011, and in subsequent 10-Q's and 10-K filings through the Company's 2014 10-K.

94.     Defendant Willis, as Global Power CFO, signed the 2011 10-K and 2012 10-K. Each of these filings reflected the false information about Global Power's goodwill account, and misstated Global Power's goodwill by $18.8 million.

95.     Willis' failure to ensure that Deltak's goodwill was properly written down was highly unreasonable, and an extreme departure from the standard of ordinary care. The misapplication of this basic accounting principle represented extreme recklessness and caused Global Power's goodwill to be overstated.

96.     The effect of the misstatement had a material impact on Global Power's reported goodwill throughout the Class Period, as reflected in the chart below:

| Goodwill (millions $) | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Reported Goodwill | $74,018 | $89,346 | $109,930 | $106,884 |
| % of Reported Goodwill Represented by Improperly Failing to Write Off Deltak Goodwill | 25.4% | 21.1% | 17.1% | 17.6% |

*Ramirez and Guba Learn the ES Segment Financials Contain Errors*

97.     The ES Segment included the Company's KW division, which was acquired by Global Power in July 2012. The ES Segment also included IBI Power, which was acquired in July 2013. Facilities were operated in South Bend Indiana and Chattanooga Tennessee, among others.

98.     For 2013, the ES Segment reported very strong—in fact, better than expected—results. However, in early 2014, according to CW 7, Peggy Gaskill contacted CW 7 and stated that she was not comfortable with the reported 2013 results financial results. In that conversation Gaskill told CW 7 "hey, we got a major issue" with the financial results. In mid-2013, the ES Segment division was transitioning to a new enterprise resource planning system ("ERP"). The new ERP showed that there were errors with ES Segment's 2013 financial results.

99.     In reviewing the ES Segment's reported 2013 financial results in March 2014, CW 10 discovered discrepancies in the divisions WIP account and determined that revenue had been prematurely recognized on certain contracts. CW 10 informed Gaskill of this information in late March 2014 and Gaskill told CW 10 that she would discuss this issue with CW 7 and Guba. CW 10 stated that in December 2013 the KW sub-ledger was not tying to the general ledger and CW 10 had to make an adjustment to resolve this discrepancy. The Work-in-Process ("WIP") sub-ledger fell out of balance. CW 10 stated that the accounting problems continued throughout 2014. CW 10 stated that in late March 2014 she discovered $1 million of WIP from Construction Partners which should have been expensed during 2013 after Global Power acquired IBI. These involved closed jobs where the expenses should have matched the revenue that was recorded in 2013.

100.     CW 10 contacted Gaskill in March 2014 to inform Gaskill of what CW 10 had found. Gaskill instructed CW 10 to put the $1 million back into WIP. In late March or early April 2014

CW 10 provided Gaskill with a list of jobs that should have been expensed in 2013. Gaskill informed CW 10 that Gaskill was going to discuss this issue with Guba and investigate what transpired.

101.    Gaskill then informed CW 7 of these accounting errors in the ES Segment's 2013 reported financial results.

102.    Specifically, according to CW 7, Gaskill found that several projects that were reported as closed, and for which revenue was recorded, but were not fully complete, as there were still open purchase orders from suppliers which had not yet been paid. If the project was complete, all purchase orders should have been paid and there should not have been any outstanding purchase orders. Thus, the ES Segment had prematurely recorded revenue and, as a consequence, failed to properly match expenses with that revenue. Indeed, one of the many errors found in the restatement was that "[w]e did not properly accrue for certain operating expenses in the period in which they were incurred, resulting in certain expenses being recognized in the wrong period." 2015 Form 10-K/A at p. 2.

103.    Gaskill told CW 7 that she "was uncomfortable with the" 2013 financial results reported by the ES Segment. The 2013 ES Segment financial results that Gaskill was uncomfortable with were then publicly reported to investors by Global Power. According to CW 7, Gaskill claimed to have found errors after CW 10 "started going through the [financial statement] integration." Gaskill identified ten to twelve contracts that were reported as closed on the financial statements but were still open, which involved a "couple of million dollars in total revenue."

104.    CW 7 directed Gaskill to meet with Guba to review this information with him and, in early April 2014 Gaskill informed CW 7 that she met with Guba, reviewed the prematurely

recognized revenue with him, and discussed devising a plan to resolve the matter. CW 7 understood from Gaskill that Guba was to notify Ramirez about the issue.

105.    CW 10 stated that she met with Gaskill in the Atlanta airport in April 2014 and CW 10 understood that both Gaskill and CW 7 discussed the accounting problems at the ES Segment with Ramirez and Guba. At no time did Guba ever suggest a plan to resolve the revenues that were prematurely recorded at the ES Segment in 2013.

106.    In April 2014 Guba and Ramirez were thus both informed that Global Power's 2013 financial results were issued with financial statement misstatements at the ES Segment. At no point in time did either Guba or Ramirez take any steps to correct the 2013 financial results and, each time Global Power issued financial results in 2014, it compared those 2014 financial results to re-published 2013 financial results, despite knowing that the 2013 financial results contained misstatements.

107.    CW 10 stated that the KW sub-account ledger continued to be out of sync with the general ledger during the balance of her employment with KW in 2014, which was August 2014.

108.    Based on the accounting issues discovered by Gaskill and CW 10, CW 7 reduced the ES Segment's expected 2014 revenue projections by approximately $20 million as the ES Segment would not close and complete as many projects as they initially forecasted, and expenses would be higher, as the initial forecast was based on the faulty 2013 numbers. In other words, the 2014 forecast was adjusted to account for the errors identified in the 2013 results. In July 2014, CW 7 participated on a regularly scheduled call where each Global Power division presented numbers regarding where they stood year-to-date and where they were expecting to end up for the balance of the year. This call was attended by all Global Power division presidents and CFOs, Defendant

Ramirez and his staff, Defendant Guba and his staff, and Tracy Paliari, Global Power's then general counsel.

109.    CW 8 stated that after Ramirez took over as President, and throughout CW 8's tenure with Global Power thereafter, Global Power held quarterly calls with all divisional heads to review each division's financial performance and discuss financial forecasts for the rest of the year. According to CW 8, Ramirez always asked questions at the quarterly review meetings and he seemed to be aware and fully updated on everything that transpired. CW 8 said that Ramirez was "pretty hard core" as far as asking questions and pushing people to perform. CW 8 thought Ramirez was fully apprised of everything because they talked weekly about the financials. Ramirez even asked detailed questions about overhead absorption trying to understand how it worked. "How does it work? Help me understand this." CW 8 had to prepare reports for the weekly meeting, for which Ramirez specialized the format. "I thought it was ridiculous. He wanted us to try to forecast revenue and the full P&L every week for that month."

110.    On the 2014 second quarter internal conference call, held in July 2014, CW 7 reported ES Segment's forecasted revenues for 2014 would be reduced by $20 million because of the accounting problems uncovered in the 2013 financial results due to problems in reconciling the sub-ledger with the general ledger. CW 7 explained that the overall ledger was reporting higher revenues than the ES Segment was actually earning, so the original financial projection was based on inaccurate 2013 results and the 2014 financial expectations had to therefore be adjusted. On the call both Ramirez and Guba expressed their displeasure that the ES Segment was reducing its revenue forecast and with the amount it was being reduced.

111.     CW 10 stated that they participated in the July 2014 quarterly conference call. During this call CW 10 stated that CW 7 made Ramirez and Guba aware of the accounting issues at the ES Segment. Specifically, CW 10 stated that the "accounting issues" involved the ES Segment's sub-ledger and general ledger not correlating, which resulted in the creation of inaccurate financial results.

112.     After the quarterly call described above, Ramirez contacted CW 7 to discuss the problems at ES Segment. Ramirez decided to set up a weekly call with the ES Segment, so he and Guba could review their business opportunities and determine how to make up the revenue that was being reduced in CW 7's new forecast, which resulted from reducing the forecast to account for the 2013 accounting errors at the ES Segment. According to CW 7, Ramirez was hoping for Global Power to hit its numbers as 2014 "was a year that [Ramirez] had an opportunity to get back a bonus from the board." Ramirez directed the ES Segment to create a "scorecard" to allow them to manually track projects and compare those numbers to what the ERP was reporting in the hopes of boosting the ES Segment's revenue. At no time did either Ramirez or Guba suggest any course of action to correct the financial statement errors at the ES Segment.

113.     CW 7 stated that the ES Segment then had weekly calls to review the information from the "scorecard" from mid-July 2014 through the division's reporting of the third quarter financial results in late September 2014. Ramirez and Guba participated in almost every one of these weekly calls, unless they were travelling or out of town. CW 7 estimates that Ramirez participated in about 90% of these weekly calls.

114.     CW 10 confirmed that, after the July 2014 quarterly conference call, there was a weekly call with Ramirez and Guba to discuss the ES Segment's financial results and to update

projected sales and backlog. CW 7 participated in these weekly calls until CW 10 resigned from Global Power in August 2014.

115.    The purpose of these weekly calls was not to attempt to correct the ES Segment's accounting errors but to find ways to make up the revenue that would be "lost" due to correcting for the accounting errors at the division.

116.    In late September 2014, Ramirez called CW 7 to discuss the ES Segment's third quarter financial results, which he had just received via email from Gaskill. CW 7 indicated that CW 7 had not yet looked at the email. Ramirez said that Gaskill's email indicated that the ES Segment was going to take a major third quarter loss and would have another loss in the fourth quarter. Ramirez wanted to know how it was possible that ES Segment would sustain such a loss.

117.    CW 7 then contacted Gaskill who explained that when Gaskill was going through the numbers, she made adjustments based on the list of contracts that should have remained open that were closed at year-end 2013 and which Gaskill reviewed with Guba in April 2014. When accounting for contracts that should be open, it swung the ES Segment to a loss for Q3 and an expected loss for Q4 2014.

118.    Thus, Gaskill was correcting the errors in the ES Segment's 2013 financial results which had a negative impact on, and were directly affecting, the third and fourth-quarter 2014 financial results. Ramirez and Guba were expressly informed by CW 7 and Gaskill that the ES Segment would incur third and fourth-quarter losses due to the errors from 2013. Rather than correcting the 2013 or 2014 financial results, Ramirez and Guba focused on finding ways to increase the ES Segment's revenue to conceal the erroneously reported financial results.

119.     Despite learning of a major third quarter loss and a likely fourth-quarter loss, Global Power issued its 2014 third- and fourth-quarter results which showed large earnings increases and which made no disclosure of any losses in either quarter in the Product Services division (of which the ES Segment is a part). Ramirez and Guba each signed the Company's public filings for each of these quarters and they each signed their Sarbanes-Oxley certifications attesting that the financial results were free from errors and that Global Power's internal controls were sufficient.

120.     The day after Ramirez called CW 7 to discuss the Gaskill email showing a loss for Q3, Ramirez contacted CW 7 again and stated he wanted an in-person meeting in Atlanta, Georgia. The meeting was scheduled and occurred on a Friday in October 2014 at Global Power's Williams Industrial Service headquarters in Atlanta. In attendance were each of the plant managers for the ES Segment division, Gaskill, Keri Jolly, Global Power's Chief of Human Resources, Tom Weissenbuehler, a Global Power consultant, and former IBI chief operating officer, Ramirez, and Guba.

121.     According to CW 7, Ramirez questioned everyone at the meeting regarding how the ES Segment could be losing money.

122.     After the October 2014 meeting in Atlanta, Ramirez contacted CW 7 and stated he was removing the Chattanooga facility from CW 7's oversight and that CW 7 was to no longer be involved in that plant. Ramirez then set up a call with all Chattanooga employees advising them that CW 7 no longer had any responsibility for the Chattanooga plant.

123.     During the call, CW 7 informed Ramirez that CW 7 had requested IT run a report to check out labor costs and verify the numbers. For example, this report would show if someone

was charging for 20 hours of labor in a day. Ramirez told CW 7 that if she received any such report it should be immediately forwarded to Gaskill.

124.    In December 2014, while CW 7 was at a plant in Idaho, CW 7 received a call from Ramirez. During the call, CW 7 informed Ramirez that CW 7 had received the IT labor report and Ramirez directed CW 7 to forward it to Gaskill and to not do anything with the report. CW 7 recalled that during the phone call with Ramirez, Ramirez reminded CW 7 to attend his Christmas party being held at his home that weekend. Later that day Ramirez and Jolly, Global Power's chief HR officer, called CW 7 to state that CW 7 was being placed on administrative leave. Ramirez said CW 7 was being placed on administrative leave "because there is something wrong with the [ES Segment's] financials." Ramirez indicted that Global Power planned to conduct an investigation. CW 7 also recalled Ramirez telling CW 7 to not attend the Christmas party.

125.    In the first week of January 2015 Ramirez and Jolly called CW 7 and Ramirez stated that he had lost confidence in CW 7 and that CW 7 was being terminated. Ramirez refused to review the results of his so-called investigation with CW 7 despite CW 7 requesting the results.

126.    On March 9, 2015 Global Power filed its year-end 2014 Form 10-K with the SEC which included both Ramirez' and Guba's sworn SOX certifications. No mention was made of the financial problems at ES Segment or any investigation into any financial issues at Global Power.

### Global Power Lacks Internal Controls and Ramirez and Guba Are Either Aware or Recklessly Disregard It

127.    In the Restatement, Global Power acknowledged that its internal controls over financial reporting were not effective during the Class Period. Indeed, internal controls at Global Power under the stewardship of Ramirez and Guba were basically nonexistent.

128.   This is not a restatement driven by arcane and complex accounting guidance, but instead, it was driven by the Company's complete lack of internal control over financial reporting and knowledge of faulty accounting at the ES Segment.

129.   The Company admitted in the Restatement that it did not establish and implement effective supervision over finance and accounting processes.

130.   Global Power admitted that it did not design and implement effective and appropriate oversight controls over the SEC reports it filed and quarter- and year-end throughout the Class Period.

131.   Global Power admitted that it did not "maintain a sufficient complement of qualified personnel with the requisite level of technical expertise to effectively analyze, review and conclude upon technical accounting matters, and thus . . . were unable to successfully navigate such accounting matters and accurately report them in a timely manner."

132.   Global Power further admitted that it did not maintain controls over journal entries, and that journal entries did not have sufficient supporting documentation that would allow assurance over their accuracy and completeness.

133.   The Company admitted that it did not have effective controls to monitor general ledger accounts, and thus failed to perform accurate and timely account reconciliations.

134.   The Company also admitted that it did not design and maintain effective controls to provide reasonable assurance over the accuracy of many critical accounting functions:

> We did not design and maintain effective controls to provide reasonable assurance over the accuracy and completeness relating to:
>
> Recognizing revenue in accordance with the proper method, including percentage of completion and completed contract;
>
> Tracking and completeness of work-in-process;

Matching cost of goods sold with related revenue;

Reviewing contract performance to estimate expected contract losses in a timely manner;

Properly reviewing, recognizing and recording the full scope of contracts and contract modifications with our customers;

Calculating and estimating warranty expense and warranty liabilities;

Estimating accrued liabilities;

Properly reviewing valuation models supporting the goodwill impairment;

Identification and proper elimination of intercompany transactions;

Determination and recording of foreign currency translation adjustments; and

Safeguarding of physical assets.

135.    And the Company admitted that its information technology controls were also lacking:

We had material weaknesses related to information technology general controls:

We did not maintain effective controls over user access to key spreadsheets to prevent unauthorized modifications to formulas within key spreadsheet applications and to detect unauthorized changes or errors in key spreadsheet applications.

We did not maintain effective controls over user roles within accounting systems to allow for proper segregation of duties.

We did not maintain effective controls over system generated entries associated with foreign currency translation adjustments.

We determined that review processes and activities that relied on electronic data generated from our systems were ineffectively designed and incorrectly operating because of our material weakness in information technology general controls.

136.    In other words, the Company failed to take even the most basic steps to ensure that individuals could not modify critical financial and accounting information.

137.     As the Company admitted in its Restatement, amongst the many internal control issues, manual journal entries were posted to Global Power's accounting system without proper documentation and approval. In other words, anyone could post financial entries onto the Company's accounting system outside the normal course of business with no check in place about its accuracy or without documentation and authorization.

138.     In the Restatement, the Company admitted that even as of December 31, 2015, it *continued* to have "material weaknesses" in its "internal control over financial reporting."

139.     Confidential witnesses confirm that both Ramirez and Guba knew of these internal control problems. Ramirez and Guba knew, or recklessly disregarded, that the quarterly and annual reports provided to the SEC and to the market during the Class Period contained pervasive misstatements and omissions based on the presence of substantial red flags, including the complete lack of internal controls at Global Power now admitted by the Company and described above.

140.     CW 7 informed Ramirez that the ERP for ES Segment was producing inaccurate financial reports. According to CW 7, Gaskill met with Guba in April 2014 to discuss the fact that the ES Segment's 2013 financial statements contained errors. Gaskill told CW 10 that that both Ramirez and Guba were made aware that the ES Segment's reported 2013 financial results contained errors. In July 2014 CW 7 informed both Ramirez and Guba that the ES Segment's revenues for 2014 would be reduced because of financial reporting errors. In September 2014, Ramirez and Guba were informed that the ES Segment would incur losses for both the 2014 third and fourth quarters, in part, to account for the 2013 prior financial statement misstatements.

141.     As part of the restatement, Global Power admitted that, among other things, it "did not design and maintain effective controls to provide reasonable assurance over the accuracy and

completeness relating to: Recognizing revenue in accordance with the proper method, including percentage of completion and completed contract; Tracking and completeness of work-in-process; Matching cost of goods sold with related revenue; Reviewing contract performance to estimate expected contract losses in a timely manner…" These were the very accounting errors that CW 7 and Gaskill made Ramirez and Guba aware of throughout 2014 as discussed in paragraph 140 above.

142.    CW 1 served as corporate SOX and external audit liaison supporting external audit requests for SOX and year-end audits and reviews from November 2012 until October 2014. CW 1 worked to resolve compliance concerns and implemented key control processes. CW 1 reported to the Chief Accounting Officer until August 2013 and directly to CFO Willis until the end of 2013.

143.    CW 1 directly communicated with auditors from Global Power's then outside auditing firm BDO. In late 2013, BDO auditors expressed concern to CW 1 about the level of turnover in the accounting department that was transpiring at Global Power in late 2013, around the time of Willis's departure, and was concerned about the need for Global Power to strengthen controls around its review process given the amount of turnover at the Company. CW 1 repeatedly conveyed this information to Guba at meetings starting in late 2013. Guba dismissed BDO's concerns. CW 1 stated that they raised these concerns during five or six staff meetings beginning in late 2013 and through October 2014, each of which were attended by Guba, but that no one ever addressed BDO's concerns.

144.    CW 2 was Global Power's Director of Accounting and SEC Reporting from August 2011 through July 2013, and as the Company's Corporate Controller from August 2013 through November 2013. CW 2 reported that Ramirez substantially cut back on administrative expenses

when he took over, and that all six members of the Company's accounting department left the
Company within a six-month period beginning in August 2013.

145.    CW 2 stated that Ramirez cut the accounting department's budget for training to
$0, and oversaw staff accountants and other administrative staff leaving at Global Power's
Williams and Braden divisions.

146.    CW 2 states that accounting information and reports went to the entire Global
Power executive team, including Ramirez, every week, with published financials being released
every month. CW 2 states that Ramirez was focused on quarterly numbers, often asking who
should be fired if numbers were not made.

147.    CW 4 was the Senior Financial Analyst: Financial Planning & Analysis from June
2014 until May 2015, based in Irving. As part of his job, CW 4 attended weekly meetings with
Ramirez and Guba.

148.    CW 4 corroborated that CW 1 informed both Guba and Ramirez of the concerns
expressed by BDO as set forth in paragraph 143.

149.    CW 5 was Global Power's Director of SEC Reporting from January through August
2014. CW 5 worked not for Global Power directly, but for Thomas Edwards Group (*i.e.*, a staffing
agency.)

150.    CW 5 stated that upon their arrival in early 2014, there was almost nobody in the
accounting department, and only consultants from outside staffing agencies doing almost all
internal accounting-related work at Global Power during that time.

151.    Together, these confidential witnesses paint a picture of a Company with lax
internal controls and almost no internal accounting or auditing function during the Class Period.

Ramirez and Guba were focused on making numbers and committed to reducing administrative expenses (at the cost of a working and functioning internal audit and accounting department). Ramirez and Guba were aware of the internal control issues that caused the massive restatement, but chose to ignore them.

152.    In the Restatement, the Company acknowledged that it concluded that the Company's internal controls and procedures were not effective "due to material weaknesses in [the Company's] internal control over financial reporting," and admits that a material weakness is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis."

### E.    Global Power's Financial Results Were Materially Misstated

153.    Ramirez and Guba knew the ES Segment's 2013 and 2014 financial results were misstated. In restating their financial results, Global Power restated nearly *every* line of *every* financial statement provided by the Company (and signed by the Individual Defendants) during the Class Period.

154.    The sheer number, size, timing, nature, frequency, and context of the errors presented in the quarterly and annual reports made by Global Power and signed by the Individual Defendants is mind-boggling and illustrates the wrongdoing that pervaded Global Power's culture under the stewardship of Ramirez and Guba.

155.    Among the numerous financial ratios and figures considered critically important by investors are retained earnings, earnings-per-share, gross profit, and shareholder equity.

156.    Retained earnings measures the net assets generated by a firm from operations exceeding declared dividends. The Retained Earnings account accumulates the amounts of these

undistributed earnings over time. In other words, retained earnings represents the earnings a company has not (yet) paid out as dividends, and represent money that a company could use to reinvest into its core business, diversify, or pay to shareholders.

157.    The chart below represents the false retained earnings figures stated by Global Power in 2012, 2013, and 2014, along with the restated figures, and shows the difference between the two:

| Retained Earnings (millions of dollars) | 2012 | 2013 | 2014 |
|---|---|---|---|
| Global Power's original 10-K report (false) | $201.4 | $206.9 | $211.8 |
| Global Power's restatement | $193.8 | $197.0 | $143.7 |
| Difference ($) | ($7.6) | ($9.9) | ($68.1) |
| Difference (%) | (3.8%) | (4.8%) | (32.2%) |

158.     In 2014, under the stewardship of Ramirez and Guba, Global Power misstated its retained earnings by over $68 million, or more than 32%.

159.     Earnings per share is an important metric that looks at how much profit a company made per each share outstanding. Investors use this metric to value a company and decide whether or not to invest.

160.     The charts below represent the false earnings-per-share information stated by Global Power in 2013 and 2014, along with the restated figures, and shows the difference between the two:

| Earnings Per Share (basic) | 2012 | 2013 | 2014 |
|---|---|---|---|
| Global Power's original 10-K report (false) | $1.04 | $0.68 | $0.66 |
| Global Power's restatement | $0.73 | $0.54 | ($2.78) |
| Difference ($) | ($0.31) | ($0.14) | ($3.44) |
| Difference (%) | -29.8% | -20.6% | -521.2% |

| Earnings Per Share (diluted) | 2012 | 2013 | 2014 |
|---|---|---|---|
| Global Power's original 10-K report (false) | $1.02 | $0.68 | $0.65 |
| Global Power's restatement | $0.72 | $0.54 | ($2.78) |
| Difference ($) | ($0.30) | ($0.14) | ($3.43) |
| Difference (%) | -29.4% | -20.6% | -527.7% |

161.     In 2014, under the stewardship of Ramirez and Guba, Global Power misstated its earnings per share by over 500%. Rather than *earning* 66 cents per share in 2014, the Company actually *lost* $2.78 cents per share.

162.    Net income measures the profitability of a Company's overall operations. The number is critical to investors in valuing a stock.

163.    The chart below represents the false net income information stated by Global Power for 2013 and 2014, along with restated figures, and shows the difference between the two:

| Net Income (millions of dollars) | 2013 | 2014 |
|---|---|---|
| Global Power's original, false 10-K reports | $11.8 | $11.1 |
| Global Power's restatement | $9.4 | ($47.2) |
| Difference ($) | ($2.4) | ($58.3) |
| Difference (%) | (20%) | (524%) |

164.    Gross profit measures a company's total sales or revenue minus the cost associated with producing and selling such revenue. In other words, it is a measure of a company's profitability. The number is critical to investors in valuing a stock.

165.    The chart below represents the false gross profit information stated by Global Power for 2013 and 2014, along with restated figures, and shows the difference between the two:

| Gross Profit (millions of dollars) | 2013 | 2014 |
|---|---|---|
| Global Power's original, false 10-K reports | $85.0 | $90.8 |
| Global Power's restatement | $80.8 | $73.3 |
| Difference ($) | ($4.2) | ($17.5) |
| Difference (%) | (5%) | (19%) |

166.    In 2014, under the stewardship of Ramirez and Guba, Global Power misstated its Gross Profit by $17.5 million dollars, or almost 19%.

167.    Shareholders' equity measures the wealth of shareholders and is calculated by subtracting total liabilities form total assets (since, if all liabilities were paid off with assets, what remains would belong to shareholders). This number is critically important to investors when valuing a company.

THIRD AMENDED                                                                                    47
CLASS ACTION COMPLAINT

168.    The chart below represents the false shareholders' equity information stated by Global Power for 2012, 2013, and 2014, along with restated figures, and shows the difference between the two:

| Shareholders Equity (millions of dollars) | 2012 | 2013 | 2014 |
|---|---|---|---|
| Global Power's original 10-K report (false) | $270.0 | $279.6 | $281.2 |
| Global Power's restatement | $262.6 | $269.7 | $212.8 |
| Difference ($) | ($7.4) | ($9.9) | ($68.4) |
| Difference (%) | (2.7%) | (3.5%) | (24.3%) |

169.    In 2014, Global Power, under the stewardship of Ramirez and Guba, misstated its retained earnings by $68.4 million, or 24.3%.

170.    These figures are critically important financial measures relied upon by investors, and each one was materially false when provided by Global Power in filings signed by the Individual Defendants.

171.    Note that *none* of these errors caused the Company's financial health to be *understated* when made. Every single admitted false statement made by the Company in its SEC filings described above *overstated* the financial health of Global Power. Each of the errors that led to the misstatement had the effect of making Global Power look more financially sound than it really was.

172.    While these measures of a company's financial health are critical, they were not the only misstated figures the Company admitted to in the restatement. For example, the Company's restatement admitted that nearly every line of the Company's 2014 balance sheet was incorrect:

| ($ in thousands) | As reported | Reclassifications | Revenue Recognition | | Job Costing | Warranty | Other | As restated |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Percent Complete | Completed Contract | | | | |
| **ASSETS** | | | | | | | | |
| Current assets: | | | | | | | | |
| Cash and cash equivalents | $ 8,810 | $ — | $ — | $ — | $ — | $ — | $ 106 | $ 8,916 |
| Restricted cash | 1 | | | | | | | 1 |
| Accounts receivable, net | 115,351 | — | — | (81) | (15) | — | (233) | 115,022 |
| Inventories: | | | | | | | | |
| Raw material | 7,528 | (17) | (506) | — | (75) | — | — | 6,930 |
| Finished goods | 1,177 | 17 | | | | | | 1,194 |
| Inventory reserve | (426) | — | — | — | — | — | (760) | (1,186) |
| Costs and estimated earnings in excess of billings | 57,918 | — | 3,087 | — | 54 | (7,968) | 1 | 53,092 |
| Deferred tax assets | 5,011 | — | — | — | — | — | (5,011) | — |
| Other current assets | 6,945 | 278 | — | (316) | (60) | — | (144) | 6,703 |
| Total current assets | 202,315 | 278 | 2,581 | (397) | (96) | (7,968) | (6,041) | 190,672 |
| Property, plant and equipment, net | 22,847 | 14 | — | — | 148 | — | (112) | 22,897 |
| Goodwill | 106,884 | — | — | — | — | — | (18,971) | 87,913 |
| Intangible assets, net | 59,070 | — | — | — | — | — | — | 59,070 |
| Deferred tax assets | 2,590 | — | — | — | — | — | (2,590) | — |
| Other long-term assets | 841 | — | — | — | — | — | 250 | 1,091 |
| Total assets | $ 394,547 | $ 292 | $ 2,581 | $ (397) | $ 52 | $ (7,968) | $ (27,464) | $ 361,643 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | | |
| Current liabilities: | | | | | | | | |
| Accounts payable | $ 18,856 | $ (13,789) | $ — | $ (115) | $ 8,842 | $ — | $ 383 | $ 14,177 |
| Accrued compensation and benefits | 21,213 | 2 | — | — | — | — | 1,171 | 22,386 |
| Billings in excess of costs and estimated earnings | 14,459 | — | — | 4,316 | (5,304) | (1,761) | — | 11,710 |
| Accrued warranties | 1,996 | — | — | — | — | 4,491 | — | 6,487 |
| Other current liabilities | 5,583 | 13,711 | — | 439 | 1,348 | — | 249 | 21,330 |
| Total current liabilities | 62,107 | (76) | — | 4,640 | 4,886 | 2,730 | 1,803 | 76,090 |
| Long-term debt | 45,000 | — | — | — | — | — | — | 45,000 |
| Deferred tax liabilities | — | — | — | — | — | — | 21,697 | 21,697 |
| Other long-term liabilities | 6,237 | 368 | — | — | — | — | (567) | 6,038 |
| Total liabilities | 113,344 | 292 | — | 4,640 | 4,886 | 2,730 | 22,933 | 148,825 |
| Commitments and contingencies (Note 15) | | | | | | | | |
| Stockholders' equity: | | | | | | | | |
| Common stock, $0.01 par value, 170,000,000 shares authorized and 18,395,472 shares issued, and 17,129,119 and shares outstanding | 184 | | | | | | | 184 |
| Paid-in capital | 71,528 | — | | | | | | 71,528 |
| Accumulated other comprehensive income | (2,252) | — | (552) | — | (295) | 449 | 107 | (2,543) |
| Retained earnings | 211,756 | — | 3,133 | (5,037) | (4,539) | (11,147) | (50,504) | 143,662 |
| Treasury stock, at par (1,266,353 common shares) | (13) | | | | | | | (13) |
| Total stockholders' equity | 281,203 | — | 2,581 | (5,037) | (4,834) | (10,698) | (50,397) | 212,818 |
| Total liabilities and stockholders' equity | $ 394,547 | $ 292 | $ 2,581 | $ (397) | $ 52 | $ (7,968) | $ (27,464) | $ 361,643 |

(1)   Other adjustments to correct the as previously reported consolidated balance sheet as of December 31, 2014 primarily consist of the allocation of Deltak goodwill as detailed earlier in this note in "(E) Other a.," the tax consequences of the restatement entries and the determination to record valuation allowance against all of our U.S. and certain foreign deferred tax assets, $1.2 million of additional accruals to correct unrecorded severance and bonuses and other adjustments including foreign currency translation and inventory reserves.

173.    The chart above shows that nearly every figure reported in 2014 was false (including cash, inventory, tax assets, property, plant and equipment, goodwill, accounts payable, accrued compensation, billings in excess of costs and estimated earnings, accrued warranties, and other liabilities). Indeed, "other current liabilities" grew from the misstated $5.6 million to $21.3 million, a difference of over 280%. Total assets were falsely stated as $394.5 million in the 2014 10-K, but were actually $361.6 million, a difference of over 8%.

174.    Similarly, the Company's 2013 and 2014 statement of operations were full of falsehoods:

| | | | Year Ended December 31, 2013 | | | | | |
| | | | Restatement Adjustments | | | | | |
| | | | Revenue Recognition | | | | | |
| ($ in thousands) | As reported | Reclassifications | Percent Complete | Completed Contract | Job Costing | Warranty | Other | As restated |
|---|---|---|---|---|---|---|---|---|
| Revenues | | | | | | | | |
| Mechanical Solutions | $ 208,194 | $ (60,258) | $ (4,976) | $ — | $ — | $ — | $ (1,900) | $ 141,060 |
| Electrical Solutions | — | 60,258 | — | (11,428) | — | — | — | 48,830 |
| Services | 276,024 | — | — | — | — | — | — | 276,024 |
| Total revenue | 484,218 | — | (4,976) | (11,428) | — | — | (1,900) | 465,914 |
| Cost of revenue | | | | | | | | |
| Mechanical Solutions | 160,983 | (45,922) | (10,179) | — | (929) | 4,043 | (1,261) | 106,735 |
| Electrical Solutions | — | 45,963 | — | (62) | (5,863) | — | — | 40,038 |
| Services | 238,231 | — | — | — | — | — | 100 | 238,331 |
| Total cost of revenue | 399,214 | 41 | (10,179) | (62) | (6,792) | 4,043 | (1,161) | 385,104 |
| Gross profit | 85,004 | (41) | 5,203 | (11,366) | 6,792 | (4,043) | (739) | 80,810 |
| Selling and marketing expenses | 9,319 | — | — | — | — | — | (93) | 9,226 |
| General and administrative expenses | 57,041 | (419) | — | — | — | — | 148 | 56,770 |
| Depreciation and amortization expense(1) | 6,599 | — | — | — | — | — | 230 | 6,829 |
| Total operating expenses | 72,959 | (419) | — | — | — | — | 285 | 72,825 |
| Operating income (loss) | 12,045 | 378 | 5,203 | (11,366) | 6,792 | (4,043) | (1,024) | 7,985 |
| Interest expense, net | 893 | — | — | — | — | — | — | 893 |
| Foreign currency (gain) loss | — | 535 | — | — | — | — | (734) | (199) |
| Other expense (income), net | 83 | (157) | — | — | — | — | 46 | (28) |
| Total other expense | 976 | 378 | — | — | — | — | (688) | 666 |
| Income (loss) from continuing operations before income tax | 11,069 | — | 5,203 | (11,366) | 6,792 | (4,043) | (336) | 7,319 |
| Income tax benefit | (437) | — | — | — | — | — | (1,403) | (1,840) |
| Income (loss) from continuing operations | 11,506 | — | 5,203 | (11,366) | 6,792 | (4,043) | 1,067 | 9,159 |
| Discontinued operations: | | | | | | | | |
| Income from discontinued operations, net of tax | 279 | — | — | — | — | — | — | 279 |
| Income from discontinued operations | 279 | — | — | — | — | — | — | 279 |
| Net income (loss) | $ 11,785 | $ — | $ 5,203 | $ (11,366) | $ 6,792 | $ (4,043) | $ 1,067 | $ 9,438 |

| | | | Year Ended December 31, 2014 | | | | | |
| | | | Restatement Adjustments | | | | | |
| | | | Revenue Recognition | | | | | |
| ($ in thousands) | As reported | Reclassifications | Percent Complete | Completed Contract | Job Costing | Warranty | Other | As restated |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | |
| Mechanical Solutions | $ 222,250 | $ (70,184) | $ (4,925) | $ — | $ — | $ | $ (1,231) | $ 145,910 |
| Electrical Solutions | — | 70,184 | — | 7,083 | 13 | | — | 77,280 |
| Services | 316,295 | — | — | — | (432) | | — | 315,863 |
| Total revenue | 538,545 | — | (4,925) | 7,083 | (419) | | (1,231) | 539,053 |
| **Cost of revenue** | | | | | | | | |
| Mechanical Solutions | 177,144 | (60,448) | 1,007 | — | (740) | 6,697 | (891) | 122,769 |
| Electrical Solutions | — | 60,438 | — | 366 | 10,414 | 1,081 | (2) | 72,297 |
| Services | 270,571 | — | — | — | 261 | (288) | 109 | 270,653 |
| Total cost of revenue | 447,715 | (10) | 1,007 | 366 | 9,935 | 7,490 | (784) | 465,719 |
| Gross profit | 90,830 | 10 | (5,932) | 6,717 | (10,354) | (7,490) | (447) | 73,334 |
| Selling and marketing expenses | 9,814 | (1) | | | | | 232 | 10,045 |
| General and administrative expenses | 55,892 | 692 | | | | | 2,163 | 58,747 |
| Depreciation and amortization expense(1) | 8,535 | — | — | — | — | | (209) | 8,326 |
| Total operating expenses | 74,241 | 691 | — | — | — | | 2,186 | 77,118 |
| Operating income (loss) | 16,589 | (681) | (5,932) | 6,717 | (10,354) | (7,490) | (2,633) | (3,784) |
| Interest expense, net | 1,710 | — | | | | | 110 | 1,820 |
| Foreign currency (gain) loss | — | (1,073) | | | | | 1,008 | (65) |
| Other (income) expense, net | (288) | 392 | — | — | — | | (70) | 34 |
| Total other expense | 1,422 | (681) | — | — | — | | 1,048 | 1,789 |
| Income (loss) from continuing operations before income tax | 15,167 | — | (5,932) | 6,717 | (10,354) | (7,490) | (3,681) | (5,573) |
| Income tax expense | 4,017 | — | | | | | 37,644 | 41,661 |
| Income (loss) from continuing operations | 11,150 | — | (5,932) | 6,717 | (10,354) | (7,490) | (41,325) | (47,234) |
| **Discontinued operations:** | | | | | | | | |
| Loss from discontinued operations, net of tax | (1) | — | — | — | — | | — | (1) |
| Loss from discontinued operations | (1) | — | | | | | — | (1) |
| Net income (loss) | $ 11,149 | $ — | $ (5,932) | 6,717 | $ (10,354) | $ (7,490) | $ (41,325) | $ (47,235) |

175.   As shown above, in 2013, the Company claimed a net income of $11.785 million, when in fact net income was $9.438 million. And in 2014, the Company overstated net income by $58.384 million: it claimed to have made $11.149 million when it had in fact lost $47.235 million.

176.     The full extent of the misstatements made by the Company throughout the Class Period and certified by Ramirez and Guba are reflected throughout the restatement, but particularly on pages F-12 to F-21 in the document attached as Exhibit Y to this Complaint.

**F.    Analysis of Key Misstatements and Accounting Errors Made During the Class Period**

177.     The Company admitted to four major accounting changes driving the restatement:

(A) *Conversion to Percentage-of-Completion Accounting:* GAAP specifies the criteria for companies to use in determining whether to utilize the percentage-of-completion or completed contract methods of accounting for revenue recognition. During the period form 2011 through 2014, we historically recognized revenue from virtually all of our contracts in the Mechanical Solutions segment under the completed contract method of accounting. We determined in late 2015 that although we had the requisite information available, for certain of our business units, to have historically utilized the percentage-of-completion method of accounting, we erroneously utilized the completed contract method. Concurrently, we did not reduce recognized revenue in a timely manner for contractual liquidated damages that we incurred on certain projects as a result of late delivery and/or performance issues. We have recorded the necessary adjustments to retrospectively apply percentage-of-completion accounting to our Mechanical Solutions segment for the period 2011-2014.

(B) *Completed Contract Revenue Recognition:* In our Electrical Solutions segment, for which we utilized completed contract accounting because we lacked the requisite information to utilize percentage-of-completion accounting, we discovered various errors involving recognizing revenues before the contract was completed and/or before units were shipped/delivered and title transferred. Additionally, we failed to reduce recognized revenue in a timely manner for contractual liquidated damages that we incurred on certain projects as a result of late delivery and/or performance issues. We have recorded the necessary adjustments to record revenue in the proper period.

(C) *Job Cost Capitalization, Estimation and Expensing:* We identified various errors in our job cost accounting practices, including errors in the capitalization of manufacturing overhead, failing to accrue for subcontractor liabilities while the work was in progress, failing to estimate and recognize loss contracts in a timely manner and failing to properly match the cost of goods sold with the related revenue in the

proper period. Additionally, as noted in the revenue recognition discussion above, our Mechanical Solutions segment were erroneously not utilizing the percentage-of-completion method of accounting. These errors resulted in misstatements in our reported cost of goods sold, costs and estimated earnings in excess of billings, billings in excess of costs and estimated earnings, and accrued liabilities.

(D) *Warranty Reserves:* We improperly interpreted the accounting requirements for recording and reporting warranty reserves and failed to properly incorporate into our warranty estimates information available to us during the various subsequent events periods in our original filings, which resulted in errors in our reported warranty reserve and warranty expense amounts.

Restatement at F-12.

178.    The Company's use of the completed contract method of revenue recognition in the Mechanical Solutions segment rather than using the percentage-to-complete revenue recognition method is also illustrative of the Company's lack of internal controls.

179.    The general principles behind those two methodologies was issued by the then GAAP principles provided by the American institute of Certified Public Accountants ("AICPA") called Accounting Research Bulletins ("ARBs"). ARB 45, "Long-term Construction-Type Contracts" was issued in and became effective in October 1955. ARB 45 provided generally accepted methods at paragraph 3, which states:

> Two accounting methods commonly followed by contractors are the percentage-of-completion method and the completed-contract method.
>
> **Percentage-of-Completion Method**
>
> The percentage-of-completion method recognizes income as work on a contract progresses. The committee recommends that the recognized income be that percentage of estimated total income, either:
>
> (a) that incurred costs to date bear to estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or
>
> (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

180.    Paragraph 9 of ARB 45 provides guidance regarding the completed-contract method:

> The completed-contract method recognizes income only when the contract is completed, or substantially so.

181.    In 1981, the Financial Accounting Standards Board ("FASB") issued the Statement of Position ("SOP") 81-1 entitled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts. SOP 81-1 incorporated the accounting methodologies stated in ARB 45 and provides for the following revenue recognition standard:

> The pervasive principle of realization and its exceptions and modifications are central factors underlying accounting for contracts. APB Statement 4 states:
>
> Revenue is generally recognized when both of the following conditions are met: (1) the earnings process is complete or virtually complete, and (2) an exchange has taken place. [Paragraph 150]
>
> Revenue is sometimes recognized on bases other than the realization rule. For example, on long-term construction contracts revenue may be recognized as construction progresses. This exception to the realization principle is based on the availability of evidence of the ultimate proceeds and the consensus that a better measure of periodic income results. [Paragraph 152]
>
> The exception to the usual revenue realization rule for long-term construction- type contracts, for example, is justified in part because strict adherence to realization at the time of sale would produce results that are considered to be unreasonable. The judgment of the profession is that revenue should be recognized in this situation as construction progresses. [Paragraph 174]

182.    Thus, this is not a complex accounting issue. Indeed, it is an accounting standard that has been part of the guidance for decades. Current accounting guidance provides for similar revenue recognition methodologies is provided by the FASB and is called Accounting Standards Codification ("ASC") 605-35-25-1. It reads:

> In accounting for contracts, the basic accounting policy decision is the choice between two generally accepted methods: the percentage-of-completion method including units of delivery and the completed-contract method. The determination of which of the two methods is preferable is based on a careful evaluation of the circumstances **because the methods should not be acceptable alternatives for the same circumstances.**

(emphasis added).

183.    Global Power is in the business of manufacturing engineered equipment, and thus should be able to apply this simple construction accounting guidance that has been standard for decades. Yet the Company disclosed in its restatement that from 2011 through 2014 that it "recognized revenue from virtually all of our contracts in our Mechanical Solutions segment under the completed contract method of accounting." This, the Company admits, was in violation of GAAP "because [Global Power] had sufficient information available to use the percentage-of-completion method for the period from 2011 through 2014."

184.    The Company historically used the completed contract method for revenue recognition in its ES Segment because the Company lacked sufficient information to use the percentage-of-completion method. Alarmingly, however, the Company was recognizing revenue in the ES Segment before the contract was completed and/or before the units were shipped or delivered and title was transferred to the customer.

185.    In fact, according to CW 7, Gaskill brought this issue to the attention of CW 7 in early 2014, noting she was concerned about the ES segment's financial results. According to CW 7, in April 2014 Gaskill met with Guba to review ten to twelve contracts for which millions in revenue was recognized before the contract was completed. CW 7 understood that Guba discussed this with Ramirez. In July 2014, this information was further conveyed to Ramirez when CW 7 reduced the ES Segment's expected 2014 revenue by $20 million. The original 2014 ES Segment

forecast was based on the erroneous 2013 financial results, which were discovered to be false. CW 7 adjusted the 2014 expectations to reflect the true 2013 results. In other words, in 2013 the ES Segment prematurely recognized revenue from contracts which it reported as completed even though they were not, and the same problem continued into 2014. Ramirez and Guba were both aware of the premature recognition of revenue in 2013 and 2014 in the ES Segment.

186.    Defendants' conduct violated GAAP and was also contrary to the Company's accounting policy, as disclosed in its 2014 10-K (discussed below and attached as Exhibit W):

> Substantially all of our Product Solutions segment revenue is derived from fixed-priced contracts. Revenue for gas turbine auxiliary and control house equipment is recognized on the completed contract method, typically when the unit is shipped. Certain of these contracts specify separate delivery dates of individual equipment units or require customer acceptance of a product. In circumstances where separate delivery dates of individual equipment units exist, we recognize revenue when the customer assumes the risk of loss and title for the equipment, which is generally the date the unit is shipped, and corresponding costs previously deferred are charged to expense. In circumstances where the contract requires customer acceptance of a product in addition to transfer of title and risk of loss to the customer, revenue is either recognized (i) upon shipment when we are able to demonstrate that the customer specific objective criteria have been met or (ii) upon customer acceptance. Once title and risk of loss have transferred and, where applicable, customer acceptance is complete, we have no further performance obligations.

187.    This premature recognition of revenue from an incomplete project is not due to the interpretation of complex accounting guidance, but again results from the misapplication of basic accounting principles. As the Company has admitted in the restatement, it operated in an environment where any Company personnel could override the accounting system and allow for revenue to be recognized at any time. It is unsurprising that this lack of controls caused the resulting accounting errors. It also resulted from faulty internal controls. CW 7 stated that Gaskill identified ten to twelve contracts for which revenue was prematurely recognized in 2013; Gaskill

discussed this with Guba in 2014 and the ES Segment's results were reduced in 2014 due to this premature revenue recognition issue, that CW 7 brought to Ramirez' attention. Ramirez and Guba knew, or recklessly disregarded, that Global Power issued 2013 and 2014 financial results that prematurely recognized revenue.

188.     CW 6 reported that issues surrounding Global Power's difficulty in forecasting the cost-to-completion method was discussed at quarterly Disclosure Control Committee meetings which were attended by Guba, beginning with the quarterly meeting that occurred in or around May 2014.

189.     The Company also failed to timely incur liabilities for contractual liquidated damages in 2012, 2013, and 2014. The Company violated GAAP, ASC 450-20-05-4, and its own accounting policies by failing to timely record these liquidated damages. Liquidated damages should have been recognized when project milestones were not met.

190.     The restatement also included errors for job cost accounting practices including: (1) errors in the capitalization of manufacturing overhead; (2) not always accruing for subcontractor liabilities for current projects; (3) not always estimating and recognizing loss contracts in a timely manner; and (4) not always properly matching cost of goods sold to revenue.

191.     Because the Company recognized revenue prior to project completion, these errors would cause cost capitalization and other expenses to be misaligned with the corresponding revenue, violating the fundamental matching principle of accounting, which requires related expenses to be recorded at the time of revenue recognition.

192.     The Company also failed to properly incorporate available information during subsequent event periods in the calculation of its warranty reserves. Warranty reserve is a

contingent liability and thus information occurring during subsequent event periods that existed as of the financial statement period must be considered in calculating such a contingent liability in accordance with GAAP. Again, this is not a complex accounting standard, but a common accounting practice that requires that all subsequent events that might have a financial impact on a company's financial statement to be considered to determine whether the event was in existence prior to financial period close. The failure to record appropriate warranty reserves was a violation of ASC 50 for contingent liability recognition.

193.    Additionally, the Company admitted that it "did not properly eliminate intercompany transactions between reportable segments and certain product groups within [the] Mechanical Solutions segment." Again, this illustrates a complete lack of internal controls. These missing entries are necessary to ensure that transactions between related intercompany entities are not counted twice.

194.    The Company also acknowledged that it failed to identify obsolete inventory. Again, this is one of the oldest and most basic accounting principles. ASC 330-10-35-1 provides guidance regarding adjustments for the value of a company's inventory to the lowest cost on the market, including reducing the value of inventory due to physical deterioration, obsolescence, or price change. The reduction should have been accounted for as a loss; Global Power failed to do so.

195.    The result of these errors, caused by the complete lack of internal controls at Global Power under the stewardship of Ramirez and Guba, resulted in the Company making numerous false reports to the SEC and investors throughout the class period.

## G.      The False and Misleading Statements

### *Sarbanes-Oxley Certifications*

196.      Each of the above-referenced 10-Q and 10-Ks filed with the SEC contained certain certifications made pursuant to SOX.

197.      Among other things, the certifications require the signer to attest that they have reviewed the report, that it does not contain untrue statements, that it fairly represents the financial condition of the company, that the company's internal controls are effective. Each SEC filing contained the following SOX certification:

> 2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the registrant and we have:
>
>> a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

198.    Defendant Ramirez signed a SOX certification containing the language set forth above for each of the Company's 10-Q's for 1Q 2013, 2Q 2013, 3Q 2013, 1Q 2014, 2Q 2014, and 3Q 2014, as well as for the Company's 10-Ks for 2012, 2013, and 2014.

199.    Defendant Guba signed a SOX certification containing the exact language set forth as described above for each of the Company's 10-Q's for 1Q 2014, 2Q 2014, and 3Q 2014, as well as for the Company's 10-K's for 2013 and 2014.

200.    As set forth above, Ramirez and Guba knew, or recklessly disregarded, that Global Power's internal accounting controls were deficient, and contained material weaknesses. Ramirez

and Guba were responsible for creating that environment by, among other things, disregarding that the ERP for the ES segment was producing inaccurate financial numbers, ignoring inquiries about internal controls, reducing internal accounting staff, and reducing the training budget for accounting to zero, yet they falsely signed certifications assuring that they had designed and evaluated effective internal controls.

201.    Ramirez and Guba knew, or recklessly disregarded, that due to the presence of the glaring accounting errors and red flags described throughout this Complaint and the restatement that their certifications were false and that the SEC filings contained misstatements and omissions.

202.    That the certifications were false is also shown by the Company's statements on May 6, 2015, October 26, 2015, and January 26, 2016 (described above) which explained that the Company's financial results could not be relied upon, as well as by the Company's March 30, 2016 statement (also described in detail above), which explained that the Company and its auditors had found "material weaknesses in the Company's internal control over financial reporting," including "potential internal control implications" of "supporting documentation for manual journal entries."

### The False and Misleading Financial Statements

### September 2011 8-K

203.    On September 7, 2011, the Company filed on form 8-K with the SEC a pro forma financial statement reflecting the disposition of "substantially all of the operating assets of Deltak L.L.C. for $31.0 million in cash." The exhibit disclosed that, after adjusting for working capital, net book value of the disposed asset, and transaction costs, the Company saw a pre-tax gain of $14.1 million, or a post-tax gain of $8.6 million from the transaction.

204.    The 8-K was materially false and misleading, as the Company admitted in the restatement. Specifically, the Company acknowledged that when it sold Deltak, it did not write-off the associated goodwill, but rather improperly moved the balance of Deltak's goodwill to the Company's Mechanical Solutions segment:

> At the time of the sale of our former subsidiary, Deltak LLC (*"Deltak"*), in 2011, we **erroneously concluded that Deltak was not a separate reporting unit for the evaluation of the carrying value compared to fair value of goodwill**. As a consequence of that conclusion, we allocated $18.8 million of goodwill from Deltak's books to Mechanical Solutions, which resulted in an $18.8 million overstatement of the 2011 pre-tax gain on the sale of Deltak. Consequently, we have erroneously been carrying the related $18.8 million of goodwill on our balance sheets since that time. The after-tax effect of this change totaled $11.5 million as of December 31, 2011 and was reflected as a decrease to the December 31, 2012 opening balance of accumulated retained earnings in our consolidated financial statements in this Form 10-K.

205.    Under GAAP, the goodwill should have been written off in fiscal 2011, at the time of the Deltak Transaction.

206.    As a result, rather than a pre-tax gain of $14.1 million, the Company suffered a pre-tax loss of $4.7 million because of the Deltak Transaction.

207.    Defendant Willis was the Chief Financial Officer of Global Power at the time of the transaction and signed the September 7, 2011 8-K.

***2011 Year End Form 10-K, 2012 Year End Form 10-K***

208.    On March 14, 2012, the Company filed on form 10-K with the SEC an annual report for year-end 2011. The filing stated that the Company's goodwill was $74.0 million.

209.    On March 7, 2013, the Company filed on form 10-K with the SEC an annual report for year-end 2012. The filing stated that the Company's goodwill was $89.4 million.

210.    The goodwill numbers stated by the Company in the 2011 and 2012 10-K filings described above were materially false and misleading, as the company admitted in the restatement that goodwill was overstated by $18.8 million following the Deltak Transaction.

211.    The materially false and misleading 2011 and 2012 10-Ks were signed by Defendant Willis.

212.    Global Power's misstatement of goodwill related to Deltak continued in quarterly and annual filings made throughout the class period.

***First Quarter 2013 (Exs.[5] I & J)***

213.    On May 9, 2013, the Company filed on form 10-Q with the SEC a quarterly report for 1Q 2013. The filing is attached as Exhibit I and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its financial results for the first quarter of 2013. That release is attached as Exhibit J and is incorporated by reference into this Complaint.

214.    Among other things, the 1Q 2013 and press release discloses that the Company earned $116,710,000 in total revenue at a cost of $100,744,000, for a gross profit of $15,966,000. The Company reported net loss of $1,241,000, or a loss of 7 cents per share.

215.    The Company admitted in the restatement that the financial results presented in the 1Q 2013 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

---

[5]    References to "exhibits" refer to all of the exhibits to the Second Amended Complaint (ECF No. 76.) which are expressly incorporated herein by reference.

216.    The filing was signed by Defendant Ramirez and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and described above.

### Second Quarter 2013 (Exs. K & L)

217.    On August 3, 2013, the Company filed on form 10-Q with the SEC a quarterly report for 2Q 2013. The filing is attached as Exhibit K and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its financial results for the second quarter of 2013. That release is attached as Exhibit L and is incorporated by reference into this Complaint.

218.    Among other things, the 2Q 2013 and press release discloses that the Company earned $115,965,000 in total revenue at a cost of $97,162,000, for a gross profit of $18,803,000. The Company reported net income of $741,000, or 4 cents per share.

219.    The Company admitted in the restatement that the financial results presented in the 2Q 2013 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

220.    The filing was signed by Defendant Ramirez and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and described above.

### Third Quarter 2013 (Exs. M & N)

221.    On November 7, 2013, the Company filed on form 10-Q with the SEC a quarterly report for 3Q 2013. The filing is attached as Exhibit M and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its financial results

for the third quarter of 2013. That release is attached as Exhibit N and is incorporated by reference into this Complaint.

222.    Among other things, the 3Q 2013 and press release discloses that the Company earned $109,998,000 in total revenue at a cost of $89,272,000, for a gross profit of $20,726,000. The company reported net income of $1,302,000, or 8 cents per share.

223.    The Company admitted in the restatement that the financial results presented in the 3Q 2013 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

224.    The filing was signed by Defendant Ramirez and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and described above.

### *Year-End 2013 (Exs. O & P)*

225.    On March 17, 2014, the Company filed on form 10-K with the SEC an annual report for 2013. The filing is attached as Exhibit O and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its 2013 year-end financial results. That release is attached as Exhibit P and is incorporated by reference into this Complaint.

226.    Among other things, the 2013 Form 10-K and the press release discloses that the Company earned $484,218,000 in total revenue for the year at a cost of $399,214,000, for a gross profit of $85,004,000. The Company reported net income of $11,785,000, or 70 cents per share.

227.    The Company admitted in the restatement that the financial results presented in the 2013 Form 10-K and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

228.    The filing was signed by Defendants Ramirez and Guba and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and Guba and described above.

### First Quarter 2014 (Exs. Q & R)

229.    On May 2, 2014, the Company filed on form 10-Q with the SEC a quarterly report for 1Q 2014. The filing is attached as Exhibit Q and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its first quarter 2014 financial results. That release is attached as Exhibit R and is incorporated by reference into this Complaint.

230.    Among other things, the 1Q 2014 and press release discloses that the Company earned $104,882,000 in total revenue at a cost of $86,404,000, for a gross profit of $18,478,000. The Company reported a net loss of $79,000, or 0 cents per share. The 1Q 2014 10-Q includes republished 2013 quarterly and annual financial data described above.

231.    The Company admitted in the restatement that the financial results presented in the 1Q 2014 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

232.    The filing was signed by Defendants Ramirez and Guba and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and Guba and described above.

### Second Quarter 2014 (Exs. S & T)

233.    On June 29, 2014, the Company filed on form 10-Q with the SEC a quarterly report for 2Q 2014. The filing is attached as Exhibit S and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its second quarter

2014 financial results. That release is attached as Exhibit T and is incorporated by reference into this Complaint.

234.    Among other things, the 2Q 2014 filing and press release discloses that the Company earned $114,739,000 in total revenue at a cost of $94,477,000, for a gross profit of $20,262,000. The company reported net income of $774,000, or 5 cents per share. The 2Q 2014 10-Q includes republished 2013 quarterly and annual financial data described above.

235.    The Company admitted in the restatement that the financial results presented in the 2Q 2014 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

236.    The filing was signed by Defendants Ramirez and Guba and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and Guba and described above.

*Third Quarter 2014 (Exs. U & V)*

237.    On October 30, 2014, the Company filed on form 10-Q with the SEC a quarterly report for 3Q 2014. The filing is attached as Exhibit U and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its third quarter 2014 financial results. That release is attached as Exhibit V and is incorporated by reference into this Complaint.

238.    Among other things, the 3Q 2014 filing and press release discloses that the Company earned $145,128,000 in total revenue at a cost of $120,447,000, for a gross profit of $24,681,000. The company reported net income of $4,524,000, or 26 cents per share. The 3Q 2014 10-Q includes republished 2013 quarterly and annual financial data described above.

239.    The Company admitted in the restatement that the financial results presented in the 3Q 2014 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

240.    The filing was signed by Defendants Ramirez and Guba and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and Guba and described above.

**Year-End 2014 (Exs. W & X)**

241.    On March 9, 2015, the Company filed on form 10-K with the SEC an annual report for 2014. The filing is attached as Exhibit W and is incorporated by reference into this Complaint. The Company also issued a press release on the same day disclosing its 2014 year-end financial results. That release is attached as Exhibit X and is incorporated by reference into this Complaint.

242.    Among other things, the 2014 Form 10-K filing and press release discloses that the Company earned $538,545,000 in total revenue for all of 2014 at a cost of $447,715,000, for a gross profit of $90,830,000. The Company reported net income of $11,149,000, or 65 cents per share. The 2014 10-K includes republished 2013 financial data described above.

243.    The Company admitted in the Restatement that the financial results presented in the 2Q 2013 and the press release were materially false and misleading as the Company's financial statements were not presented in accordance with GAAP and its financial results were overstated.

244.    The filing was signed by Defendants Ramirez and Guba and contained the false Sarbanes-Oxley certification describing Global Power's internal controls signed by Ramirez and Guba and described above.

**H.    Global Power Discloses the Pendency of this Case
       and an Ongoing SEC Investigation into Its Restatement**

245.    As part of its restatement, Global Power acknowledged the existence of this

litigation:

> **A pending securities putative class action, as well as an ongoing SEC
> investigation, could divert management's focus, result in substantial
> expenses and have an adverse impact on our reputation, financial
> condition and results of operations**.
>
> The matters that led to our internal investigation and the restatement of our
> financial results **expose us to greater than typical risks associated with
> litigation**, regulatory proceedings and government enforcement actions.
> For instance, a putative shareholder class action is pending in the U.S.
> District Court for the Northern District of Texas alleging violations of the
> federal securities laws in connection with matters related to the restatement
> of our financial results. The consolidated amended complaint filed by the
> lead plaintiff names the Company and two of our former officers as
> defendants. Please see "Item 3. Legal Proceedings" and "Note 16—
> Commitments and Contingencies" to our consolidated financial statements.
> We cannot predict the outcome of the lawsuits, the magnitude of any
> potential losses or the effect such litigation may have on us or our
> operations. Regardless of the outcome, lawsuits and investigations involving
> us, or our current or former officers and directors, could result in significant
> expenses and divert attention and resources of our management and other
> key employees. We could be required to pay damages or other penalties or
> have injunctions or other equitable remedies imposed against us or our
> current or former directors and officers. In addition, we are generally
> obligated to indemnify our current and former directors and officers in
> connection with lawsuits, governmental investigations and related litigation
> or settlement amounts. Such amounts could exceed the coverage provided
> under our insurance policies. Any of these factors could harm our
> reputation, business, financial condition, results of operations or cash flows.

(emphasis added).

246.    The restatement also provided the news that the SEC is formally investigating the

Company for "possible securities law violations" by the Company:

> [T]he Division of Enforcement of the SEC is conducting a **formal
> investigation into possible securities law violations by us relating to our
> disclosures concerning certain financial information, including our cost**

**of sales and revenue recognition, as well as related accounting issues**. We are cooperating with the SEC in its investigation. Please see "Item 3. Legal Proceedings." At this time, we cannot predict the outcome or the duration of the SEC investigation or any other legal proceedings or any enforcement actions or other remedies that may be imposed on us as a result of the SEC investigation. Any action by the SEC could result in sanctions against us and certain of our current and former officers and directors. A protracted investigation could impose substantial additional costs and distractions, regardless of its outcome. Furthermore, publicity surrounding the foregoing or any enforcement actions resulting from the SEC's investigation, even if ultimately resolved favorably for us, could have a material adverse impact on our reputation, business, financial condition and results of operations.

## CLASS ACTION ALLEGATIONS

247.    Lead Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired Global Power common stock between September 7, 2011[6] and May 6, 2015 inclusive. Excluded from the Class are Defendants, directors and officers of Global Power, as well as their families and affiliates.

248.    The members of the Class are so numerous that joinder of all members is impracticable. Global Power's 2014 Form 10-K stated that, as of March 4, 2015, there were 17,169,871 shares of common stock outstanding and as of June 27, 2014 there were 16,990,175 shares of common stock available for trading on the public markets.

249.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to members of the Class which predominate over questions which may affect individual Class Members include:

---

[6]    As discussed, Plaintiff has not removed Willis as a Defendant nor the allegations involving the Deltak transaction for purposes of preserving this issue for appeal. Without the Deltak allegations, however, the class period would begin on May 9, 2013.

    a.   Whether the Exchange Act was violated by Defendants;

    b.   Whether Defendants omitted and/or misrepresented material facts;

    c.   Whether Defendants' statements omitted material facts necessary in order to make the statements made; in light of the circumstances under which they were made, not misleading;

    d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.   Whether the price of Global Power ordinary shares were thereby artificially inflated; and

    f.   The extent of damage sustained by Class members and the appropriate measure of damages.

250.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged in this Complaint.

251.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

252.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

253.    Lead Plaintiff intends to rely upon the presumption of reliance established by the fraud-on-the-market doctrine. Among other things:

    a.   Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

d.   Plaintiff and other members of the Class purchased Global Power common stock between the time Defendants made their misrepresentations and failed to disclose material facts and the time the true facts were disclosed, all without knowledge of the misrepresented and omitted facts.

254.    At all relevant times, the market for Global Power securities was efficient, as (i) Global Power filed periodic public reports with the SEC; (ii) Global Power regularly communicated with public investors via established market communication mechanisms (*e.g.*, press releases, earnings calls, analyst presentations, etc.); (iii) Global Power common stock was traded on the NYSE; (iv) its common stock reacted to material information concerning the Company; and (v) it was regularly followed by stock market security analysts.

255.    Lead Plaintiff and the Class relied on the market price of Global Power common stock, which reflected all the information in the market, including the misstatements and omissions of Defendants.

## NO SAFE HARBOR

256.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein, including statements about Global Power's earnings, were not forward-looking when made.

257.    To the extent that any of the statements are deemed to be forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

258.    The chart below reflects Global Power's closing stock price throughout the relevant time period:



259.    Global Power's stock price declined after the disclosure that investors should not rely on previously issued financial results, after it expanded its restatement, and upon the disclosure that BDO was terminated and Global Power's common stock would be delisted from the NYSE.

260.    After the close of trading on May 6, 2016 Global Power announced that its 4Q 2014 and year-end 2014 earnings should no longer be relied upon by investors. On the next trading day, May 7, 2015, Global Power common stock price from a closing price of $12.24 on May 6, 2016 to close $8.19 on May 7, 2016. On May 8, 2015 as the market continued to digest the news, Global Power's stock price fell to close at $7.66 per share.

261.    Prior to the opening of trading on October 26, 2015, Global Power disclosed that it would need to restate earnings for all of 2013 and 2014. On that day, its common stock declined from its closing price on Friday, October 23, 2015 of $4.93 per share to close at $4.40 on October 26, 2015.

262.    After the close of trading on March 30, 2016 Global Power announced that it was terminating BDO and would be delisted from the NYSE because it would be unable to timely file its financial statements. On the next trading day, its common stock price fell from its closing price on March 30, 2016 of $3.00 per share to close at $2.00 per share on March 31, 2016.

**Count I**
**Violations of Section 10(b) of the Exchange Act, and Rule 10b-5**
**(against all Defendants)**

263.    Lead Plaintiff re-alleges each allegation contained above as if fully set forth herein.

264.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

265.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii)

THIRD AMENDED                                                          74
CLASS ACTION COMPLAINT

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Global Power's common stock during the Class Period.

266.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Global Power common stock. Plaintiff and the Class would not have purchased Global Power common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count II**
**Violations of Section 20(a) of the Exchange Act**
**(against the Individual Defendants)**

267.    Lead Plaintiff re-alleges each allegation contained above as if fully set forth herein.

268.    The Individual Defendants acted as controlling persons of Global Power within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent Global Power from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the fraudulent SEC filings and other reports alleged by Plaintiff to be misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of these materials or cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

Lead Plaintiff demands judgment against Defendants as follows:

a.  A determination that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and the certification of the Lead Plaintiff as Class Representative;

b.  Damages sustained by Led Plaintiff and the Class due to the acts and transactions alleged herein;

c.  Prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs; and

d.  Any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

269.  Lead Plaintiff hereby demands a trial by jury.

January 15, 2018

Respectfully submitted,

**Kendall Law Group, LLP**

/s/ *Joe Kendall*
Joe Kendall, State Bar No. 11260700
Jamie J. McKey, State Bar No. 24045262
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
(214) 744-3000 phone
(214) 744-3015 fax
jkendall@kendalllawgroup.com
jmckkey@kendalllawgroup.com

*Liaison Counsel for Lead Plaintiff*

**Block & Leviton LLP**
Jeffrey C. Block, *pro hac vice*
Jacob A. Walker, *pro hac vice*
155 Federal Street, Suite 400
Boston, Massachusetts 02110

(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockesq.com
jake@blockesq.com

*Lead Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I certify that a copy of this document was forwarded to all counsel of record in this case via the Court's ECF system as of the date file-stamped thereon.

/s/ *Joe Kendall*
Joe Kendall