IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARGARET BUDDE, Lead Plaintiff, and DANIEL REAM, Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 3:15-cv-1679-M |
| v. | § § | |
| GLOBAL POWER EQUIPMENT GROUP, INC., RAYMOND K. GUBA, LUIS MANUEL RAMIREZ, and DAVID L. WILLIS, | § § § § § § | |
| Defendants. | § | |

## AMENDED MEMORANDUM ORDER AND OPINION

Before the Court is Defendants' Motion to Dismiss the Third Amended Class Action Complaint. (ECF No. 103). For the reasons stated on the record and in this opinion, the Motion is **GRANTED**.

I. Factual and Procedural Background

a. Overview

Defendant Global Power Equipment Group, Inc. ("Global Power") is a corporation that provides equipment and services to the energy industry. (3d. Am. Compl. ("TAC") ¶ 3, ECF No. 100). Global Power notified the public throughout 2015 and 2016 that its prior financial reports would have to be restated. (*Id.* ¶¶ 58-67). On March 15, 2017, Global Power issued the restatement and identified several causes for the errors. (*Id.* ¶ 82). Among them, Global Power acknowledged that it recognized certain revenues and expenses in the wrong period for its Electrical Solutions ("ES") Segment, had deficiencies in internal controls over financial reporting, and incorrectly accounted for goodwill upon the sale of a subsidiary company, Deltak.

1

(Ex. Y at 1-3, ECF No. 76-25).[1]

Margaret Budde and Daniel Ream, on behalf of all persons who acquired Global Power stock between May 9, 2013, and May 6, 2015, filed a class action lawsuit against Global Power and some of its former officers—Raymond K. Guba, Luis Manuel Ramirez, and David L. Willis. Guba was Global Power's Senior Vice President and CFO from November 2013 to September 2015. (TAC ¶ 36). Ramirez was the President and CEO from July 2012 to March 2015. (*Id.* ¶ 34). Willis was the CFO from January 2008 to November 2013. (*Id.* ¶ 39). Plaintiffs asserted that Defendants issued false and misleading financial reports in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. *See* 15 U.S.C. §§ 78j(b), 78t(a).

The Court previously dismissed Plaintiffs' Second Amended Complaint for failing to plausibly allege (1) scienter against the individual Defendants and (2) loss causation for misrepresentations related to the sale of Deltak. (SAC Order at 12, ECF No. 99). Plaintiffs timely filed the TAC, but declined to address the pleading defects regarding scienter as to Willis and regarding the sale of Deltak. (*See* TAC ¶ 2 n.2). Defendants move to dismiss the TAC, arguing that Plaintiffs have again failed to plausibly allege scienter as to Guba and Ramirez, and since only their conduct is at issue as agents of Global Power, their bases for dismissal also apply to the company. (Def. Br. at 1, ECF No. 104). The Court held a hearing on Defendants' Motion on July 19, 2018.

### b. Alleged Misrepresentations

The restatement affected the numbers published in every quarterly and annual financial

---

[1] Plaintiffs incorporate by reference all exhibits attached to the Second Amended Complaint. (TAC ¶ 213 n.5). When reviewing a motion to dismiss, a court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007).

report during the class period. (*See* TAC ¶ 4). Specifically, Plaintiffs identify the following reports as the bases of their claims:

| Financial Report | Publication Date | Signed By |
| --- | --- | --- |
| 2013 First Quarter 10-Q | May 9, 2013 | Ramirez |
| 2013 Second Quarter 10-Q | August 3, 2013 | Ramirez |
| 2013 Third Quarter 10-Q | November 7, 2013 | Ramirez |
| 2013 10-K | March 17, 2014 | Ramirez, Guba |
| 2014 First Quarter 10-Q | May 2, 2014 | Ramirez, Guba |
| 2014 Second Quarter 10-Q | June 29, 2014 | Ramirez, Guba |
| 2014 Third Quarter 10-Q | October 30, 2014 | Ramirez, Guba |
| 2014 10-K | March 9, 2015 | Ramirez, Guba |

(*See id.* ¶¶ 196-244). Each report contained Sarbanes-Oxley ("SOX") certifications from Ramirez and/or Guba attesting that the report "does not contain untrue statements [of material facts], that it fairly represents the financial condition of the company [in all material respects], that the company's internal controls are effective." (*Id.* ¶ 197).

### c. Scienter Allegations

Plaintiffs' scienter allegations focus on Ramirez and Guba's knowledge or reckless disregard of (1) accounting errors at Global Power's ES Segment and (2) deficiencies in internal controls over financial reporting.[2]

#### i. Accounting Errors in the ES Segment

In March 2014, Confidential Witness 10 ("CW10")[3] discovered that the ES Segment recognized certain revenues and expenses in the wrong period, causing the ES Segment's

---

[2] Of note, Defendants again argue that Plaintiffs engage in impermissible group pleading. *Cf. Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (requiring securities plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud"). As the Court held previously, (SAC Order at 5 n.4), the scienter allegations are sufficiently particularized and do not constitute group pleading. *See also Owens v. Jastrow*, 789 F.3d 529, 538 (5th Cir. 2015). For example, the TAC refers to what Guba specifically knew and when. (*See* TAC ¶ 104; *see also id.* ¶¶ 97-152).

[3] CW10 was a corporate accountant in the Koontz-Wagner Division of the ES Segment, from July 2012 to August 2014. (TAC ¶¶ 51, 97). CW10 reported to Linda Skipper, the controller for the Koontz-Wagner Division, until April 2014; thereafter, CW10 reported to Peggy Gaskill, the controller for the ES Segment. (*Id.* ¶ 51).

3

financial results already reported for 2013 to be inaccurate. (TAC ¶¶ 99-100). CW10 notified Gaskill, who then notified CW7.[4] (*Id.* ¶¶ 98, 101-03; *see also id.* ¶ 98 ("Gaskill told CW7 'hey, we got a major issue' with the financial results.")). Gaskill identified for CW7 "ten to twelve contracts that were reported as closed on the financial statements but were still open, which involved a 'couple of million dollars in total revenue.'" (*Id.* ¶ 103). CW7 directed Gaskill to meet with Guba and review the errors. (*Id.* ¶104). CW7 also adjusted the ES Segment's expected revenue projections for 2014 based on the identified errors. (*Id.* ¶ 108).

In early April 2014, Gaskill informed CW7 that she met with Guba regarding the accounting errors in the ES Segment, and CW7 "understood from Gaskill that Guba was to notify Ramirez about the issue." (TAC ¶ 104). CW10, who also met with Gaskill in April 2014, understood that Gaskill "discussed the accounting problems . . . with Ramirez and Guba." (*Id.* ¶ 105).

In July 2014, CW7 participated in a quarterly conference call where she announced that the "ES Segment's forecasted revenues for 2014 would be reduced by $20 million because of accounting problems uncovered in the 2013 financial results." (TAC ¶ 110). Both Ramirez and Guba participated in that call and "expressed their displeasure that the ES Segment was reducing its revenue forecast and with the amount it was being reduced." (*Id.*) CW10 also participated in that call and confirmed that CW7 "made Ramirez and Guba aware of the accounting issues at the ES Segment." (*Id.* ¶ 111). After that call, CW7 stated that Ramirez set up a weekly conference call with the ES Segment. (*Id.* ¶ 112). Ramirez also directed that the ES Segment create a "scorecard" to "manually track projects and compare those numbers to what the enterprise resource planning system was reporting." (*Id.*) Both Ramirez and Guba participated in "almost

---

[4] CW7 "was the President of the ES Segment from October 2012 until January 2015" and "reported directly to Ramirez." (TAC ¶ 48).

4

every one of the[] weekly calls," from mid-July 2014 to late September 2014, and at "no time did either Ramirez or Guba suggest any course of action to correct the financial statement errors at the ES Segment." (*Id.* ¶¶ 112-13; *see also id.* ¶ 115 ("The purpose of these weekly calls was not to attempt to correct the ES Segment's accounting errors but to find ways to make up the revenue that would be 'lost' due to correcting for the accounting errors.")).

In late September 2014, Gaskill emailed Ramirez and CW7 the ES Segment's 2014 third quarter financial results, which indicated that the ES Segment was going to "take a major third quarter loss and would have another loss in the fourth quarter." (TAC ¶ 116). The losses reflected the accounting errors discovered by CW10. (*Id.* ¶ 117). Ramirez discussed the results with CW7 around that time. (*Id.* ¶ 116). In October 2014, Ramirez, Guba, CW7, Gaskill, and several others also met in Atlanta to discuss the ES Segment's finances. (*Id.* ¶ 120).

### ii. Internal Controls over Financial Reporting

BDO, Global Power's outside auditing firm, contacted CW1[5] in late 2013. BDO was concerned about "the level of turnover in the accounting department . . . [and] the need for Global Power to strengthen controls around its review process given the amount of turnover." (TAC ¶ 143). BDO further indicated to CW1 that "not employing sufficiently skilled personnel negatively impacted Global Power's ability to ensure that its financial statements were being properly prepared." (*Id.* ¶ 23). CW1 conveyed BDO's concerns to Guba over the course of "five to six staff meetings beginning in [November] 2013 and through October 2014." (*Id.* ¶¶ 23, 143). According to CW4,[6] CW1 also conveyed BDO's concerns to Ramirez. (*Id.* ¶ 148).

---

[5] CW1 "served as corporate SOX and external audit liaison supporting external audit requests for SOX and year-end audits and reviews from November 2012 until October 2014." (TAC ¶ 142). CW1 "worked to resolve compliance concerns and implemented key control processes" and reported to the "Chief Accounting Officer until August 2013 and directly to CFO Willis until the end of 2013." (*Id.*)

[6] CW4 was the "Senior Financial Analyst: Financial Planning & Analysis" from June 2014 until May 2015. (TAC ¶ 147). As part of his job, CW4 attended weekly meetings with Ramirez and Guba. (*Id.*)

CW2[7] also stated that Ramirez "substantially cut back on administrative expenses when he took over, and that all six members of [Global Power's] accounting department left the Company within a six-month period beginning in August 2013." (TAC ¶ 144). Ramirez also cut the accounting department's budget for training to $0 and oversaw many accountants and other administrative staff leave Global Power. (*Id.* ¶ 145). CW5[8] stated that there was "almost nobody in the accounting department, and only consultants from outside staffing agencies doing almost all internal accounting-related work at Global Power" in early 2014. (*Id.* ¶ 150).

## II. Legal Standard

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The pleading standard Rule 8 announces does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Twombly,* 550 U.S. at 570. A court must accept all factual allegations as true, but it is not bound to accept as true "a legal conclusion couched as a factual allegation." *Id.* at 555. Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief. *Iqbal*, 556 U.S. at 678.

---

[7] CW2 was the Director of Accounting and SEC Reporting from August 2011 through July 2013. (TAC ¶ 144). CW2 was also the Corporate Controller from August 2013 through November 2013. (*Id.*)

[8] CW5 was the Director of SEC Reporting from January to August 2014. (TAC ¶ 149). He did not formally work for Global Power; he was employed by the staffing agency that contracted with Global Power. (*Id.*)

### III. Analysis

#### a. Confidential Witnesses

Most of Plaintiffs' allegations are from CWs. Allegations from CWs must be discounted. *See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("[J]udges [must] weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process."). CWs must also be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded." *Id.*; *see also Carlton v. Cannon*, 184 F. Supp. 3d 428, 460 (S.D. Tex. 2016) ("[A] complaint should give details like (1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter, such as when a relevant comment was made to the confidential source.").

Defendants argue that the CWs are not sufficiently identified in the TAC to be given any weight in the scienter analysis. (Def. Br. at 11). The Court disagrees. The TAC provides each CW's job description, period of employment, and the bases of the CW's knowledge in the information pleaded. (*See* TAC ¶¶ 48, 51, 97, 142, 144, 147, 149). The TAC also goes into detail of when and how a CW came to know certain information, e.g., by attending weekly meetings with Guba and Ramirez. Accordingly, each CW is described with sufficient particularity; the Court previously held the same on substantially the same allegations.[9] (*See*

---

[9] Nothing in the TAC, however, would support the conclusion that CW7 or CW10 possess any information on the accuracy of Global Power's financial results outside of the ES Segment. Though, president of the ES Segment, CW7 "is not a Certified Public Accountant and had no role in preparing or disseminating Global Power's financial results. She can only provide information [on what] she has knowledge of and what she discussed with Ramirez and Guba and not whether Global Power's financial results were properly presented to investors." (ECF No. 96 at 10 n.5 (Plaintiffs' Response to Defendants' Motion to Dismiss the Second Amended Complaint)). The same is true of CW10, who was an accountant for the ES Segment. Allegations suggesting otherwise are not considered by the Court.

7

Order at 4 n.2).

Defendants appear to equate facts necessary to support a strong inference of scienter with facts necessary to support the conclusion that the CW would possess the information pleaded. (*See* Def. Br. at 12). Courts must discount facts alleged by confidential witnesses, but the threshold for even considering those allegations is a different inquiry. Defendants also highlight case law indicating that "opinions [of confidential witnesses] add nothing to [the] scienter analysis." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 862 (S.D. Tex. 2016). However, nothing prohibits the Court from considering factual matters, such as that Guba repeatedly heard concerns about internal controls during staff meetings. Finally, Defendants emphasize that CWs are often reporting hearsay, but that "does not automatically disqualify [their] statement from consideration in the scienter calculus." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009). This is because "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002); *see also Tellabs*, 551 U.S. at 324 n.5 (rejecting any standard which would "transpose to the pleading stage the test that is used at the summary judgment and judgment-as-a-matter-of-law stages").

b. **Unsourced Allegations**

Allegations in the complaint that are not "based upon Plaintiffs' personal knowledge . . . [are] necessarily pleaded on 'information and belief,' although not labeled as such." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002). For allegations made on information and belief, the plaintiff must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The alleged facts may be based on personal sources, such as confidential witnesses, or documentary evidence. *ABC Arbitrage*, 291 F.3d at 352.

8

Although Defendants argue that Plaintiffs fail to provide the factual bases for each of the following allegations, (Def. Br. at 15-16), a closer reading of the TAC indicates otherwise:

| Allegation | Attribution to CW |
|---|---|
| "In April 2014 defendant Raymond Guba ('Guba'), Global Power's then Chief Financial Officer, was told by Peggy Gaskill, the then controller of Global Power's ES Segment, that the ES Segment's 2013 financial results and, as a result, Global Power's 2013's financial results, contained accounting errors." (TAC ¶ 7). | "CW 7 directed Gaskill to meet with Guba to review this information with him and, in early April 2014 Gaskill informed CW 7 that she met with Guba, reviewed the prematurely recognized revenue with him, and discussed devising a plan to resolve the matter. CW 7 understood from Gaskill that Guba was to notify Ramirez about the issue." (TAC ¶ 104).<br><br>"CW 10 stated that she met with Gaskill in the Atlanta airport in April 2014 and CW 10 understood that both Gaskill and CW 7 discussed the accounting problems at the ES Segment with Ramirez and Guba." (*Id.* ¶ 105). |
| "At no time did Ramirez or Guba offer or suggest any methods on how to correct the accounting errors at the ES Segment." (TAC ¶ 12). | CW7 and CW10 discuss how, based on their interactions, "[a]t no time did either Ramirez or Guba suggest any course of action to correct the financial statement errors at the ES Segment." (TAC ¶¶ 105, 112). |
| "[The premature revenue recognition issues mentioned in the restatement] were the very accounting issues that were reported to Ramirez and Guba beginning in April 2014." (TAC ¶ 20). | According to CW7 and CW10, Gaskill told both Guba and Ramirez in early April 2014 about the ES Segment prematurely recognizing revenue in 2013 and how there were errors with the ES Segment's 2013 financial results. (TAC ¶¶ 99-105). |
| "The purposes of [the] weekly calls [that followed the July 2014 conference call] was not to attempt to correct the ES Segment's accounting errors but to find ways to make up the revenue that would be 'lost' due to correcting for the accounting errors at the division." (TAC ¶ 115). | According to CW7, Ramirez set up a weekly call with the ES Segment so that "he and Guba could review their business opportunities and determine how to make up the revenue that was being reduced in CW 7's new forecast." (TAC ¶ 112). |
| "Rather than correcting the 2013 or 2014 financial results, Ramirez and Guba focused on finding ways to increase the ES Segment's revenue to conceal the erroneously reported financial results." (TAC ¶ 118). | Both CW7 and CW10 discuss how Ramirez and Guba did not take any action to correct the errors in the ES Segment's 2013 financial results, (TAC ¶¶ 105, 112), instead making efforts to boost revenue (*id.* ¶ 112). |
| "In September 2014, Ramirez and Guba were informed that the ES Segment would incur losses for both the 2014 third and | "Ramirez and Guba were expressly informed by CW 7 and Gaskill that the ES Segment would incur third and fourth-quarter losses due to the |

9

| | |
|---|---|
| fourth quarters, in part, to account for the 2013 prior financial statement misstatements." (TAC ¶ 140). | errors from 2013." (TAC ¶ 118). |

### c. Scienter

To state a claim under Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (citing 15 U.S.C. 78j(b)). To adequately plead scienter, the plaintiff must meet the heightened standard required under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). The PSLRA instructs the plaintiff to "state with particularity facts giving rise to a strong inference" that a defendant acted with scienter, i.e., with "intent to deceive, manipulate, or defraud or [with] severe recklessness." *Id.*; *Jastrow*, 789 F.3d at 535. Severe recklessness is limited to those "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." *Id.* Scienter must exist at the time that the misrepresentation occurred. *See Magruder v. Halliburton Co.*, 2009 WL 854656, at *8 (N.D. Tex. Mar. 31, 2009). A corporation is deemed to have scienter if the officer who made the misrepresentation has scienter. *See Southland*, 365 F.3d at 366.

The mere publication of materially false information, without more, does not establish scienter. *See Shaw Grp.*, 537 F.3d at 534. Instead, the plaintiff must show that the defendant knew that he or she was publishing materially false information or was severely reckless in

10

publishing such information.[10] *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). In particular, the plaintiff must allege what facts the defendant knew in addition to when and how he or she learned those facts. *See Magruder*, 2009 WL 854656, at *14 n.121. Conclusory allegations are not sufficient. *See Shaw Grp*, 537 F.3d at 538-39 ("[G]eneral allegations and conclusory statements, such as stating [defendants] knew . . . adverse material" cannot support a strong inference of scienter.). A "strong" inference of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 314. This requires the court to "engage in a comparative evaluation," weighing "not only inferences urged by [the plaintiff]," but also "competing inferences rationally drawn from the facts alleged." *Id.* A tie favors the plaintiff. *Jastrow*, 789 F.3d at 536. Overall, the court must "assess all the allegations holistically," not each in isolation. *Tellabs*, 551 U.S. at 326.

Here, allegations support the conclusion that Guba and Ramirez knew they were publishing false information. Gaskill allegedly told Guba and Ramirez in April 2014 that that the ES Segment prematurely recognized a "couple of million dollars in total revenue" and failed to recognize $1 million in cost. (TAC ¶¶ 7, 99, 103-105). Gaskill told them that these errors affected the ES Segment's 2013 financial results, which would necessarily impact Global Power's overall 2013 financial results. (*Id.*) They were also repeatedly reminded of the errors throughout 2014, in July and again in September. These allegations support the conclusion that Guba and Ramirez knew, starting in April 2014, that Global Power's 2013 financial results were

---

[10] Similarly, SOX certifications associated with such publications can only support a strong inference of scienter if "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements and omissions." *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) (citation omitted).

11

false or that they were severely reckless as to their falsity. Yet, Guba and Ramirez continued to republish the 2013 financial results in SEC filings.[11] Only with the restatement did Guba and Ramirez disclose errors (1) "recognizing revenues before the contract was completed and/or before units were shipped/delivered and title transferred" and (2) "accruing for certain operating expenses in the period in which they were incurred." (*Id.* ¶¶ 20, 102).

The allegations, however, do not support the conclusion that Guba and Ramirez knew they were publishing *materially* false information. *See Abrams*, 292 F.3d at 432. Materiality is determined by "evaluating whether there is a substantial likelihood that the false or misleading statement would have been viewed by the reasonable investor as having altered the total mix" of information made available." *ABC Arbitrage*, 291 F.3d at 359 (internal quotation marks omitted). Put another way, "[a] statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Id.* There is no question that the restatement materially changed Global Power's financial results. (*See* TAC ¶ 163 (showing, after the restatement, a 20% decrease in net income reported for 2013 and 524% decrease in net income reported for 2014); *see also id.* ¶¶ 160, 165, 168, 173). But this was caused by a number of issues, with accounting errors in the ES Segment being only one of them. Knowledge of Global Power's 2013 financial results being off by a "couple of million dollars" due to accounting errors in the ES Segment is not knowledge of a material falsity, especially considering that Global Power reported nearly $500 million in revenue and $400 million in cost.[12] (TAC ¶174). The TAC does not attempt to connect either

---

[11] The allegations, however, do not suggest that Guba or Ramirez knew that the same type of accounting errors in the ES Segment continued through 2014. CW7 told both Guba and Ramirez in July 2014 that reported revenues from the ES segment would be adjusted for the accounting errors. Guba and Ramirez also implemented a process to manually confirm the ES Segment's accounting to make sure that numbers were being accurately reported.
[12] As the restatement showed, the change in Global Power's 2013 financial results attributable to the ES Segment's accounting errors at issue is 2.36% (for total revenue) or 0.0001% (for total cost). No reasonable investor would consider such information important in making a decision to invest. *See also Taubenfeld v. Hotels.com*, 385 F.

Ramirez or Guba to knowledge of the other, larger accounting errors driving the restatement, such those related to percentage-of-completion, job cost, goodwill, and warranty reserves, none of which are in issue here. (Ex. Y at 1-3). Furthermore, knowledge as to errors in the ES Segment alone does not support knowledge or reckless disregard of errors in other parts of Global Power. The compelling inference is that Guba and Ramirez knew of *immaterial* errors limited to the ES Segment.

Other allegations in the TAC also fail to support a strong inference of scienter. Plaintiffs allege that Ramirez and Guba knew of or recklessly disregarded Global Power's lack of internal controls. Guba and Ramirez knew that BDO had concerns about turnover in the internal audit department. Ramirez also oversaw the departure of numerous accountants and reduced the accounting department's budget to $0. However, Plaintiffs also allege that Guba and Ramirez hired consultants from outside staffing agencies to handle almost all internal accounting-related work. (TAC ¶¶ 144-45, 150). The inference to be drawn is that Ramirez and Guba addressed BDO's concerns by hiring outside consultants in favor of an in-house staff. In fact, BDO annually audited Global Power's internal controls and found that Global Power "maintained, in all material respects, effective control over financial reporting," as stated in Global Power's 2013 and 2014 10-K.[13] (Ex. O at F-4, ECF No. 76-15; Ex. W at F-3, ECF No. 76-23). Accordingly, Plaintiffs do not plausibly allege that Ramirez and Guba knew of or recklessly disregarded

---

Supp. 2d 587, 593 (N.D. Tex. 2004) (holding immaterial as a matter of law "loss [which] would result in approximately $4 million in lost revenues for the fourth quarter, which, expressed as a percentage, is less than 1.5% of fourth quarter revenue"); *Romine v. Acxiom Corp.*, 296 F.3d 701, 706-07 (8th Cir. 2002) (holding that $2.3 million adjustment on $211.5 million in revenue, for a 1.09% difference, was not a material difference); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) ("Defendants' alleged overstatement of assets by $6.8 million was immaterial as a matter of law. Taken in context, this amount represented only 2% of Gateway's total assets.").

[13] Plaintiffs focus on the fact that BDO was later fired during Global Power's restatement process, causing the restatement to be delayed and Global Power to be de-listed from the New York Stock Exchange. (Pl. Resp. at 24-25, ECF No. 105). Even if BDO "turned a blind eye to the accounting problems, and did a horrendously poor job," (Pl. Resp. at 25), there are no allegations indicating that Ramirez or Guba knew that BDO was incompetent at the time of publication of Global Power's financial reports.

Global Power's lack of internal controls.

Plaintiffs also highlight the magnitude of the restatement as supporting scienter. The magnitude of the misstated financials, while surely significant, does not support a strong inference of scienter without allegations that Guba or Ramirez knew that they were publishing materially false information or were severely reckless in publishing such information. *See Shaw Grp.*, 537 F.3d at 540 (holding that the "magnitude and egregiousness of [the defendant's] premature revenue recognition . . . cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements"). A plaintiff cannot establish scienter based simply on the magnitude of the restatement because courts do not recognize allegations of fraud by hindsight and much of the restatement is based on issues not germane to the claims here. *Jastrow*, 789 F.3d at 545.

Also unpersuasive are allegations related to Guba and Ramirez's motive to make misrepresentations because their compensation was tied to Global Power's financial performance. Such allegations "are not the types of motive that support a strong inference of scienter." *Abrams*, 292 F.3d at 434. Incentive compensation "can hardly be the basis for which an allegation of fraud is predicated" because if the Court were to hold otherwise, "the executives of virtually every corporation in the United States would be subject to fraud allegations." *Id.*

## IV. Section 20(a) Claim

Under Section 20(a), "[e]very person who, directly or indirectly, controls any" corporation that is found "liable under any provision of this chapter . . . shall also be liable jointly and severally with" the corporation. 15 U.S.C. § 78t(a). Plaintiffs must therefore establish a primary violation under Section 10(b) before liability arises under Section 20(a) against the individual Defendants. *See ABC Arbitrage*, 291 F.3d at 348 n.57. Because Plaintiffs

do not state a claim for any violation of Section 10(b), their Section 20(a) claims must also be dismissed.

## V. Conclusion

For the reasons stated above, Defendants' Motion is **GRANTED**. Plaintiffs conceded at the hearing that they do not have new factual allegations to supplement the TAC. Accordingly, Plaintiffs' claims are **DISMISSED WITH PREJUDICE**. *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."). A final judgment consistent with this Order will be promptly issued.

**SO ORDERED**.

September 26, 2018.

*[signature]*
BARBARA M. G. LYNN
CHIEF JUDGE